694 S.E.2d 60

**The STATE, Respondent,**

v.

**Syllester D. TAYLOR, Appellant.**

**No. 4687.**

Court of Appeals of South Carolina.

Submitted June 1, 2009.

Decided May 13, 2010.

Rehearing Denied June 24, 2010.

Appellate Defender Elizabeth A. Franklin–Best, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Assistant Deputy Attorney General Christina J. Catoe, all of Columbia; and Solicitor Edgar Lewis Clements, III, of Florence, for Respondent.

SHORT, J.

Syllester D. Taylor appeals his conviction and thirty-year sentence for possession with intent to distribute (PWID) cocaine base, arguing the trial court erred in admitting the drug evidence because the officers lacked reasonable suspicion to stop him or probable cause to search his tennis ball. We

agree. Therefore, we reverse Taylor's conviction and vacate his sentence.[1]

## FACTS

On July 25, 2006, between 10:30 and 11:00 p.m., Florence County Sheriff's Deputy Toby Bellamy received an anonymous tip indicating "a black male on a bicycle ... [was] possibly selling dope" on the "dirt portion of Ervin Street." The tip did not include a clothing description. Bellamy drove his patrol car down Gilyard Street, which intersects Ervin Street, and observed a black male, later identified as Taylor, riding a bicycle on the dirt road. Bellamy testified he decided to approach the area on foot to "see exactly what was basically going on." Bellamy and Lieutenant Darren Yarborough walked toward the intersection of Ervin and Gilyard Streets. As they turned onto Ervin Street from Gilyard Street, Bellamy again observed Taylor on a bicycle, this time "huddled close together" with another black male. As the officers approached, Bellamy did not witness anything pass between the two men. However, Bellamy testified when Taylor and his companion noticed the officers nearing, Taylor mounted his bicycle and rode toward Bellamy, while the other individual walked in the opposite direction toward the wooded area. Taylor pedaled past Bellamy on his bicycle, glanced at him, and Bellamy ordered him to stop. When Taylor ignored Bellamy's second command to stop and get on the ground, Bellamy conducted an arm-bar takedown. As a result, Taylor was forced off his bicycle and onto the ground. Once apprehended, Bellamy searched Taylor and discovered a tennis ball containing crack cocaine.

Taylor was arrested and charged with PWID cocaine base. At trial, Taylor sought to exclude the drug evidence, arguing the stop, search, and arrest were unlawful. During an *in camera* hearing, Bellamy testified to receiving an anonymous tip of possible drug activity in an area known for previous drug related incidents; observing Taylor on a bicycle where the tipster indicated; approaching Taylor on foot; and witnessing Taylor engrossed in a close conversation with another

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

individual.[2] Additionally, Bellamy indicated Taylor's close proximity to the other man led him to suspect illegal drug activity; he stated: "in [his] line of work and with recent experiences . . . any time two males [were] that close huddled up [they were] trying to hide something . . . [and] 90 percent of the time[,] . . . some sort of illegal activity [was] going on." He stated Taylor pedaled his bicycle as if he would not stop when riding away from his companion and toward the officers. Accordingly, Bellamy ordered Taylor to put his hands up and get on the ground to ensure the officers' safety and because Bellamy believed that he had probable cause drug activity might be taking place.

Taylor argued the drug evidence should be suppressed based on *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), and *State v. Green*, 341 S.C. 214, 532 S.E.2d 896 (Ct.App.2000). Specifically, he maintained this incident arose as the result of an unreliable anonymous tip. Additionally, he alleged he was within his rights to decline to stop after Bellamy's command. Taylor also asserted the officers failed to observe him engaged in any illegal activity. He contended the anonymous tip and being in close proximity to somebody while in a high-crime area did not rise to reasonable suspicion.

The State averred the following circumstances constituted reasonable suspicion to stop Taylor: (1) the anonymous tip; (2) the area being known for drug related incidents; (3) Taylor's close conversation with another individual was denotative of criminal activity; (4) Taylor's companion's departure toward the woods when the officers approached; and (5) Taylor's getting on his bicycle and pedaling toward the officer "like [he was] not going to stop." Furthermore, the State insisted these facts were distinguishable from *J.L.* and *Green* because Taylor's close conversation suggested criminal activity, he departed the scene only when he noticed the officers, and he ignored the officers' commands to stop.

---

**2.** Bellamy articulated Taylor was "standing with his bicycle straddled between his legs kind of in a huddle with the other subject [who] was standing beside him very close." While Bellamy was "unable to tell due to the lighting . . . if anything was passed off" between the men, he nevertheless decided to approach Taylor in light of the illegal activities in the area.

The trial court admitted the drug evidence, finding the stop was based on more than the anonymous tip.[3] The trial judge referred to the officers' observations, the high-crime nature of the area, and Taylor's close proximity to his companion. While conceding Taylor's reasonable suspicion argument was persuasive, the court nevertheless believed the tipster's anonymity affected the credibility and the weight of the evidence, not its existence.[4]

Accordingly, Bellamy and Yarborough testified at trial regarding the circumstances surrounding Taylor's arrest. At the close of the State's case, Taylor renewed his prior objections and the trial court reiterated its previous denial of Taylor's motion to suppress. The jury convicted Taylor of PWID cocaine base, and the trial court sentenced him to thirty years' imprisonment.[5] This appeal followed.

## STANDARD OF REVIEW

"[T]he appellate standard of review in Fourth Amendment search and seizure cases is limited to determining whether any evidence supports the trial court's finding and the appellate

---

**3.** The trial court acknowledged Taylor correctly interpreted *J.L.* and *Green*, but explained *J.L.* and *Green* "stand for the premise that ... reasonable suspicion based solely on an anonymous tip lacks sufficient [indicia of] reliability." The court believed "if the testimony was that they had an anonymous tip, they went to the area, they found a person fitting that description on a bicycle[, t]hey walked up to him and they frisked him," then *J.L.* and *Green* would preclude the admission of the drug evidence. Nevertheless, the trial court differentiated the facts at hand from *J.L.* and *Green*, finding it was "not just solely [an] anonymous tip."

**4.** Taylor also claimed the officers lacked probable cause to continue searching him after finding the tennis ball; therefore, the drug evidence should be suppressed as fruit of an unlawful search and seizure. Bellamy testified *in camera* that after feeling a large item in Taylor's pocket, he searched his pocket to identify whether the object was a weapon. Bellamy pushed the object out of Taylor's pocket, and the tennis ball rolled on the ground. Bellamy picked the tennis ball up, squeezed it, noticed a slit, and observed what he believed to be a bag of crack cocaine inside the tennis ball. Consequently, the trial court also denied Taylor's suppression motion with regard to this argument, finding Bellamy had "the right to satisfy himself that [the] hard object was not a weapon."

**5.** Taylor was tried in his absence, and his sentence was initially sealed.

court may only reverse where there is clear error." *State v. Green,* 341 S.C. 214, 219 n. 3, 532 S.E.2d 896, 898 n. 3 (Ct.App.2000); *accord State v. Sanders,* 388 S.C. 292, 696 S.E.2d 592 (App.2009) (Shearouse Adv. Sh. No. 16 at 80); *State v. Willard,* 374 S.C. 129, 133, 647 S.E.2d 252, 255 (Ct.App.2007).

## LAW/ANALYSIS

■ Taylor argues the trial court erred in admitting the drug evidence because the officers lacked reasonable suspicion to stop him. We agree.

■ "A police officer may stop and briefly detain and question a person for investigative purposes, without treading upon his Fourth Amendment rights, when the officer has a reasonable suspicion supported by articulable facts, short of probable cause for arrest, that the person is involved in criminal activity." *State v. Blassingame,* 338 S.C. 240, 248, 525 S.E.2d 535, 539 (Ct.App.1999); *see also U.S. v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonable suspicion is a lesser standard than probable cause and allows an officer to effectuate a stop when there is some objective manifestation of criminal activity involving the person stopped." *State v. Padgett,* 354 S.C. 268, 273, 580 S.E.2d 159, 162 (Ct.App.2003) (citations omitted); *Blassingame,* 338 S.C. at 248, 525 S.E.2d at 539 ("The term 'reasonable suspicion' requires a particularized and objective basis that would lead one to suspect another of criminal activity.") (citing *U.S. v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). When evaluating an investigatory stop's validity, a court must consider the totality of circumstances. *Sokolow,* 490 U.S. at 8, 109 S.Ct. 1581. Likewise, the court "must require the agent to articulate the factors leading to that conclusion." *Id.* at 10, 109 S.Ct. 1581.

Therefore, we examine an extensive litany of cases and factors leading to reasonable suspicion in order to properly determine the appropriate application of reasonable suspicion in the instant matter.

## A. Factors Leading to Reasonable Suspicion

■ When determining whether the circumstances are sufficiently suspicious to warrant further investigation, officers are not required to ignore the relevant characteristics of a location. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). However, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.* at 124, 120 S.Ct. 673; *U.S. v. Lender*, 985 F.2d 151, 154 (4th Cir.1993) (stating a defendant's presence in a high crime area does not by itself constitute reasonable suspicion, but an officer may consider an area's propensity toward criminal activity); *accord U.S. v. Sprinkle*, 106 F.3d 613, 617 (4th Cir.1997) (articulating an individual's presence in a high-crime area, without more, will not sustain a finding of reasonable suspicion; however, the disposition of an area toward criminal activity may be considered with additional particularized factors to support a finding of reasonable suspicion).[6]

■ In addition to location, "[t]he lateness of the hour is another fact that may raise the level of suspicion." *Lender*, 985 F.2d at 154 (finding the officers' observations of the defendant in a known drug area at approximately 1 a.m. a factor contributing to reasonable suspicion).

Furthermore, an individual's innocent and lawful actions may, in certain situations, combine to suggest criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), as an example of "conduct justifying the stop [being] ambiguous and susceptible of an innocent explanation").[7] Specifically, "*Terry* recognized that

---

**6.** *Cf. Ornelas v. U.S.*, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (stating a "police officer may draw inferences based on his own experience in deciding whether probable cause exists" and an "appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable"); *State v. Davis*, 354 S.C. 348, 357, 580 S.E.2d 778, 783 (Ct.App.2003) ("[T]he law is well settled that the officer's knowledge of general trends in criminal behavior is a relevant consideration in determining probable cause.").

**7.** In *Terry*, "[t]he officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically confer-

the officers could detain the individuals to resolve the ambiguity" of their actions. *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673.

For example, in *U.S. v. Sokolow*, the United States Supreme Court found the following circumstances established reasonable suspicion to stop Sokolow:

(1) he paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage.

490 U.S. 1, 3, 109 S.Ct. 1581 (1989). The Court held "[a]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."[8] *Id.* at 9, 109 S.Ct. 1581.

Nervous, evasive behavior is also considered a pertinent factor when determining reasonable suspicion. *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673. Similarly, evasion can contribute to reasonable suspicion. *U.S. v. Lender*, 985 F.2d 151, 154 (4th Cir.1993).

In *Lender*, officers advanced to a street corner in a neighborhood known for drug activity and observed a group of four or five men, including Lender, "huddled on a corner." *Id.* at 153. The officers saw Lender with his hand outstretched and palm up and the other men looking down at his palm's contents. *Id.* As the officers neared, the group of men dispersed and Lender "walked away from the officers with his

ring." *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673. While this conduct was itself lawful, "it also suggested that the individuals were casing the store for a planned robbery." *Id.*

8. The Court rejected the argument that the analysis was altered by the agents' belief that Sokolow's behavior mimicked a drug courier profile. *Sokolow*, 490 U.S. at 10, 109 S.Ct. 1581. Instead, the Court insisted courts determining the existence of reasonable suspicion "must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by a trained agent." *Id.*

back to them." *Id.* The court determined the officers had reasonable suspicion to stop Lender because among other things, his evasive conduct failed to dispel their earlier suspicions of drug activity. *Id.* at 154. The court stated: "Evasive conduct, although stopping short of headlong flight, may inform an officer's appraisal of a streetcorner encounter." *Id.*

██ Likewise, headlong flight, "the consummate act of evasion," is suggestive of wrongdoing. *Wardlow,* 528 U.S. at 124, 120 S.Ct. 673. However, flight is not necessarily indicative of criminal activity because innocent reasons to depart from police exist. *Id.* at 124–25, 120 S.Ct. 673. Therefore, when an officer approaches an individual without reasonable suspicion or probable cause, the individual can lawfully ignore the officer. *Id.* at 125, 120 S.Ct. 673 ("[A]ny 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." (citations omitted)).[9]

 Another factor to consider when determining whether reasonable suspicion has been aroused is the existence of a tip and the quality thereof. Third party tips "completely lacking in indicia of reliability ... either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Therefore, when "a tip has a relatively low degree of reliability, more information [is] required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

---

9. *Accord Jones v. Commonwealth,* 53 Va.App. 171, 670 S.E.2d 31, 35 (2008) (finding a defendant's refusal to heed officers' requests to stop failed to serve as justification for his seizure because "citizens who are not under arrest or otherwise detained have every right to refuse or ignore requests from law enforcement officers").

In *Adams,* 407 U.S. at 146, 92 S.Ct. 1921, the United State Supreme Court found the officer was justified in responding to a known informant's tip alleging illegal activity [10] because the officer personally knew the informant, the informant provided tips in the past, and the informant "came forward personally to give information that was immediately verifiable at the scene." Additionally, the Court referenced the location,[11] the time of day, and the suspect's behavior [12] as additional justification for the officer's actions. *Id.* at 147–48, 92 S.Ct. 1921.

On the other hand, "reasonable suspicion based solely on a call made from an unknown location by an unknown caller lack[s] sufficient indicia of reliability to make an investigatory stop." *State v. Green,* 341 S.C. 214, 217, 532 S.E.2d 896, 897 (Ct.App.2000); *Florida v. J.L.,* 529 U.S. 266, 269, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) ("Anonymous tips . . . are generally less reliable than tips from known informants and can form the basis for reasonable suspicion *only* if accompanied by specific indicia of reliability, for example, the correct forecast of a subject's 'not easily predicted' movements." (quoting *White,* 496 U.S. at 332, 110 S.Ct. 2412) (emphasis added)); *Id.* at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if [the] allegations turn out to be [fabrications], 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'") (citations omitted). Therefore, in order for an anonymous tip to justify an investigatory stop, its reliability must be verified. *White,* 496 U.S. at 330, 110 S.Ct. 2412.

---

10. At approximately 2:15 a.m., the informant alleged "an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist." *Adams,* 407 U.S. at 144–45, 92 S.Ct. 1921.

11. The suspect was located in an area known for criminal activity. *Id.* at 147, 92 S.Ct. 1921.

12. When the officer reached the vehicle to investigate the tip, he tapped on the window and asked the occupant, Robert Williams, to open the door. *Id.* at 145, 92 S.Ct. 1921. "When Williams rolled down the window instead, [the officer] reached into the car and removed a fully loaded revolver from Williams'[s] waistband. The gun had not been visible . . . from outside the car, but it was in precisely the place" the informant indicated. *Id.*

114

Furthermore, anonymous tips providing readily observable information do not supply sufficient indicia of reliability to establish reasonable suspicion to justify an investigatory stop. *Green*, 341 S.C. at 218, 532 S.E.2d at 897. In *Green*, the "officer was notified that a 'black male [named] Alonzo Green was leaving the area of Bayside Manor' ... [with] a large sum of money and narcotics." 341 S.C. at 216, 532 S.E.2d at 896. The anonymous tipster identified the vehicle Green would be driving as a gray four-door Maxima and said Green recently departed Bayside Manor. *Id.* The officer stopped Green, whom he knew by sight, based solely on the anonymous tip. *Id.* As he approached Green's vehicle, he noticed Green "fumbling under the front seat." *Id.* The officer asked Green to exit the vehicle, frisked him for weapons, and discovered narcotics and a large sum of money. *Id.* At trial, Green moved to suppress all evidence found incident to the stop, arguing the stop and search violated the Fourth Amendment, to no avail. *Id.* at 216, 532 S.E.2d at 897. On appellate review, this court determined the evidence was erroneously admitted whereas the "only information available to the officer was the statement of an unknown, unaccountable informant who neither explained how he knew about the money and narcotics, nor supplied any basis for the officer to believe he had inside information about Green." *Id.* at 218, 532 S.E.2d at 898. Our court stated because the tipster remained anonymous, he did not risk his credibility and could lie with impunity; hence, because we could not "judge the credibility of the caller, ... the risk of fabrication [became] unacceptable." *Id.*

An anonymous tip can provide the basis for an investigatory stop if the officer conducting the stop verifies the tip's reliability by observing the suspect engaged in criminal activity. *White*, 496 U.S. at 331, 110 S.Ct. 2412. In *White*, an officer received an anonymous tip indicating Vanessa White would be leaving a particular apartment at a specific time; driving a brown Plymouth station wagon with a broken right taillight; and going to a certain motel carrying cocaine in a brown case. The officer stopped White after witnessing her leave the specified apartment; drive the brown Plymouth station wagon at approximately the time the tipster indicated; and travel in the direction of the named motel. *Id.* at 327, 110

S.Ct. 2412. Recognizing anonymous tips alone rarely demonstrate "the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is 'by hypothesis largely unknown, and unknowable,'" *Id.* at 329, 110 S.Ct. 2412 (quoting *Illinois v. Gates,* 462 U.S. 213, 237, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)), the United States Supreme Court concluded reasonable suspicion existed under the totality of the circumstances because "the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of [White's] car." *Id.* at 331–32, 110 S.Ct. 2412.

Nevertheless, *White* was a close case because "[k]nowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband." *J.L.,* 529 U.S. at 271, 120 S.Ct. 1375. Therefore, "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Id.*

In order to rely upon an anonymous tip to effectuate a stop, the tip must demonstrate knowledge of concealed criminal activity. *See Florida v. J.L.,* 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). For example, in *J.L.,* officers were dispatched to a bus stop after an anonymous caller [13] claimed a young black male wearing a plaid shirt at the bus stop was carrying a gun. When the officers arrived, they identified an individual matching the description, searched him, and uncovered a weapon. *Id.* "Apart from the tip, the officers had no reason to suspect any ... illegal conduct. The officers did not see a firearm, and *J.L.* made no threatening or otherwise unusual movements." *Id.* Thus, the officers' suspicion arose solely from the anonymous tip, not any perceptions of their own. *Id.* at 270, 120 S.Ct. 1375.

Emphasizing an anonymous tip's need to demonstrate knowledge of concealed criminal activity, the court elucidated:

---

13. No information about the informant or audio recording of the call existed. *J.L.,* 529 U.S. at 268, 120 S.Ct. 1375.

An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Id.* at 272, 120 S.Ct. 1375. The court held "an anonymous tip lacking indicia of reliability of the kind contemplated in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), and *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." [14] *Id.*

An additional factor to consider when determining whether reasonable suspicion exists is the officer's experience and intuition. *See Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."). Nevertheless, "a wealth of experience will [not] overcome a complete absence of articulable facts." *U.S. v. McCoy*, 513 F.3d 405, 415 (4th Cir.2008) (noting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "clearly requires that an officer ... 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion' " in order to briefly detain or frisk an individual (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868)). Furthermore, an officer's impression that an individual is engaged in criminal activity, without confirmation, does not amount to reasonable suspicion. *U.S. v. Sprinkle*, 106 F.3d 613, 617 (4th Cir.1997).

---

**14.** The court rejected a firearm exception to the standard *Terry* analysis: "If police officers may properly conduct *Terry* frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain ... that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in *Adams* and *White*, the Fourth Amendment is not so easily satisfied." *J.L.* at 273, 120 S.Ct. 1375.

In *Sprinkle*, two officers in a high-crime neighborhood observed Victor Poindexter sitting in a parked vehicle. *Id.* at 615. Officer Daniel Riccio knew Poindexter was recently released from prison after serving time for narcotics violations, but "had no reports of any criminal activity by Poindexter since his release." *Id.* at 615–16. Riccio noticed Sprinkle, whom he did not know, get into the passenger seat of Poindexter's vehicle. *Id.* at 616. As Riccio walked by the driver's side of Poindexter's vehicle to his patrol car, he "noticed Sprinkle 'huddling and talking to [ ] Poindexter' ... [toward] 'the console of the vehicle' with their hands 'close[ ] together.' " *Id.* When Poindexter saw Riccio, he put his head down, covering the left side of his face with his hand as if to conceal his identity. *Id.* Because it was a fairly bright day with plenty of sunlight, Riccio "did not see anything in either man's hands." *Id.* Furthermore, neither officer viewed "any drugs, money, guns, or drug paraphernalia in the car ... [and] Poindexter and Sprinkle did not make any movement that indicated an attempt to conceal any object inside the car." *Id.* The officers continued to their patrol cars, and Poindexter started his vehicle, pulling it into the street, and drove away in a normal, unsuspicious fashion. *Id.* After Poindexter drove approximately 150 feet, an unrelated traffic stop blocked his route. *Id.* Seizing the opportunity, the officers parked behind Poindexter's stopped vehicle, engaged their blue lights, exited the patrol car, and approached. *Id.* Riccio informed Sprinkle he was going to pat him down for weapons. *Id.* As Riccio began the pat-down, Sprinkle pushed away and began to run. *Id.* Sprinkle brandished a handgun during the foot chase and was ultimately detained and charged with possessing a handgun. *Id.*

At trial, Sprinkle moved to suppress the handgun's admission, declaring it was the fruit of an unlawful stop. *Id.* The trial court granted the motion and dismissed his indictment. *Id.* The government appealed, professing five factors combined to establish reasonable suspicion: (1) the officer's knowledge of Poindexter's criminal record and narcotics history; (2) the neighborhood being known for narcotics activity; (3) the two men huddled together in the vehicle "with their hands close together"; (4) Poindexter's attempt to hide his identity

from Riccio; and (5) Poindexter's departure "as soon as the officers walked by the car." *Id.* at 617.

On appeal, the Fourth Circuit Court of Appeals ruled the known prior criminal history of an individual was insufficient to create reasonable suspicion, but the knowledge could be combined with more concrete factors to constitute reasonable suspicion of current criminal activity. *Id.* Additionally, the court recognized the high-crime nature of the neighborhood could not provide independent or freestanding grounds for reasonable suspicion, and noted Riccio viewed Poindexter and Sprinkle at 5:30 p.m. on a sunny day. *Id.* The court mentioned the government maintained the particular acts of suspicious behavior initiated with the two men huddling toward the center console of the vehicle with their hands close together, and the acts gave Riccio " 'the impression that they were in the midst of a narcotics transaction.' " *Id.* at 617. However, the court held "it would take more for this impression to qualify as a reasonable suspicion." *Id.* The court concluded hiding one's face "is an act that may be appraised with others in deciding whether suspicion reaches the threshold of reasonableness." *Id.* at 618. Similarly, the court determined Poindexter's departure was not evasive because he "drove off right after his passenger got in the car, and the officers admitted that he drove in a normal, unhurried manner." *Id.* Ultimately, the court ascertained the officers lacked reasonable suspicion to stop Sprinkle.[15] *Id.* at 618–19. While acknowledging Riccio's curiosity was understandably aroused upon seeing Poindexter in a neighborhood with high narcotics activity, the court avowed the officers needed additional particularized evidence to indicate criminal activity. *Id.* at 618. Neverthe-

---

**15.** The government also argued if Sprinkle's initial stop was illegal, his intervening illegal acts made his handgun admissible evidence. *Sprinkle,* 106 F.3d at 619. As Riccio pursued Sprinkle, Sprinkle discharged a handgun in Riccio's direction. *Id.* The Fourth Circuit Court of Appeals agreed with the government, determining Sprinkle's illegal acts after the initial stop triggered an exception to the exclusionary rule because he "committed a new crime that was distinct from any crime he might have been suspected of at the time of the initial stop." *Id.* at 619. The court cited additional examples of intervening acts triggering the exception, including assaulting an officer and attempting to retrieve the officer's gun, aiming a weapon at an officer, shooting at an officer, and fleeing at 115 miles per hour in a vehicle while shooting at police. *Id.* at 619 n. 4.

less, the court declined to find their huddling together, Poindexter's attempt to hide his face from Riccio, or their departure established reasonable suspicion. *Id.* Significantly, the court reiterated Riccio could see inside Poindexter's vehicle and observed nothing of a criminal nature taking place or any attempt to conceal criminal activity. *Id.* at 618.

*Sprinkle* differed from *U.S. v. Lender*, 985 F.2d 151 (4th Cir.1993), because "although the police could not see ... into Lender's open hand, the fact that several men were looking to his hand indicated there was actually something in it." *Id.* at 619 n. 3. In *Sprinkle*, "Riccio's initial suspicion that Sprinkle was about to pass something to Poindexter was simply not confirmed by what Riccio actually saw" when the officers were close enough to see both men's hands. *Id.* Additionally, Lender exhibited evasive conduct by turning his back and walking away from the approaching officers, whereas Poindexter did not. *Id.* Also, while "Poindexter was parked in broad daylight on a busy street," Lender was observed on the street corner at 1:00 a.m.; therefore, the lateness of the hour contributed to reasonable suspicion to stop Lender. *Id.* Accordingly, the court found *Lender* was distinguishable and not controlling. *Id.*

## B. Application of Reasonable Suspicion Factors in the Instant Matter

In this case, Deputy Bellamy stated his belief that Taylor was involved in criminal activity was based on: (1) the anonymous tip; (2) Taylor's presence in an area associated with high crime; (3) Taylor's closeness to his companion; and (4) each man's departure from the scene when the officers approached.[16] We find the anonymous tip Bellamy relied on was one in which the reliability could not be tested because the tipster was nameless, the tipster's location was unidentified, the tipster remained unaccountable, and the tipster failed to explain the origin of the allegation of criminal activity, provide any predictive information, or supply a basis for

16. The Dissent also references the lateness of hour as a circumstance establishing reasonable suspicion. However, Bellamy did not testify he considered the time of day to contribute to his decision to stop Taylor, nor did the State argue the time of day was a contributing factor to the trial court when opposing Taylor's motion to suppress.

believing the tipster possessed inside information into Taylor's affairs. Furthermore, the tip failed to provide any specific information indicating the tipster's knowledge of concealed criminal activity; therefore, the tipster did not risk his or her credibility and was free to fabricate the information with impunity. The tip described readily observable information, such as the individual's location and appearance, and stated the individual was *possibly* selling drugs. While the anonymous tip was trustworthy in the limited sense it assisted Bellamy in identifying Taylor as a person matching the description of the individual whom the tipster wished to accuse, the tip demonstrated neither an extensive degree of familiarity with Taylor's actions, nor any independent reliability in terms of the alleged possibility of criminal activity as required by *Florida v. J.L.*, 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Therefore, due to the tip's inherent unreliability, the tip was merely a conclusory allegation and more information was required to establish the requisite quantum of suspicion before the officers were entitled to stop Taylor.

 Moreover, the officers were on Ervin Street based solely on the anonymous and unreliable tip and made no supplemental observations suggesting any illegal activity was afoot. The officers' observations did nothing more than confirm the readily noticeable conditions communicated by the anonymous tipster.[17] Additionally, Bellamy's initial suspicion remained unsubstantiated when he failed to observe Taylor behave in a way to suggest drug activity. Hence, this scenario involved an anonymous tip far less specific than the tip in *State v. Green*, 341 S.C. 214, 532 S.E.2d 896 (Ct.App.2000). There, the officer knew the individual's gender, race, name, point of origin, the model and color of his vehicle, and that he would be carrying a large sum of money and narcotics. *Id.* at 216, 532 S.E.2d at 896. Here, the officers knew a nameless tipster suspected a black man riding a bicycle on the dirt portion of Ervin Street *might be* selling drugs. The tipster failed to supply a specific description of the individual other

---

17. For example, in *Green v. State*, 77 Md.App. 477, 551 A.2d 127, 130 (1989), the Maryland Court of Special Appeals found the verification of the description of an individual's clothing and location accused of criminal activity "failed to serve as sufficient corroboration to establish reliability."

than his general mode of transportation, his readily-observable location, his gender, and his race. Accordingly, we find the anonymous tip lacked the requisite indicia of reliability to be employed as reasonable suspicion for conducting an investigatory stop.

Although our courts have recognized the nature of the neighborhood as a contributing factor for reasonable suspicion, our courts have specifically stated an individual's mere presence in an area associated with high-crime is not reasonable suspicion for an investigatory stop.[18] Thus, Taylor's presence on Ervin Street alone did not give rise to reasonable suspicion. We also find the high-crime nature of the area failed to corroborate the anonymous tipster's information so as to impart a degree of reliability to the other allegations contained in the tip.[19]

▮▮▮▮ Additionally, we find the close conversation between Taylor and his companion also did not enhance the officers' curiosities to the level of "reasonable suspicion."[20]

---

18. *See U.S. v. Perrin,* 45 F.3d 869, 873 (4th Cir.1995) ("Were we to treat the dangerousness of the neighborhood as an independent corroborating factor, we would be, in effect, holding a suspect accountable for factors wholly outside of his control.").

19. Our neighboring state of Georgia addressed a similar issue in *Swanson v. State,* 201 Ga.App. 896, 412 S.E.2d 630 (1991). In *Swanson,* an officer stopped an individual after receiving an anonymous tip alleging an individual was selling drugs. *Id.* at 631. The tip included a detailed description of the individual's clothing and his exact address. *Id.* Relying on *White,* the Georgia Court of Appeals determined even though the officer knew the address was located within a high drug trafficking area, "further observation and corroboration was required before a forcible stop was authorized." *Id.* at 632. Specifically, the court stated:

> [T]he anonymous tip contained no detailed information demonstrating the caller's ability to predict [the individual's] future behavior, and thus contained no information from which the police could have reason to believe the tipster was not only honest but also well informed enough to justify the stop ... [and the officer's] knowledge that the address was in a high drug trafficking area [failed to corroborate] the anonymous tipster's information so as to impart a degree of reliability to the other allegations made by the caller.
> *Id.*

20. While the Dissent notes the trial court emphasized Bellamy's curiosity that Taylor was engaged in criminal activity based on his closeness

Deputy Bellamy did not testify he saw anything pass between the two men when he noticed them "huddled" close together, nor did he witness Taylor attempt to conceal anything. While Bellamy's curiosity was understandably aroused after observing an individual matching the description given by the anonymous tipster engaged in a close conversation with another male in an area known to have previous drug activity at night, we find the officers needed additional particularized facts indicating criminal activity in order to support a finding of reasonable suspicion. Moreover, we find because the officers lacked reasonable suspicion to stop Taylor, his riding his bicycle toward the officers was lawful. *See Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (maintaining an individual can lawfully ignore an officer if the officer approaches without reasonable suspicion or probable cause). Furthermore, we emphasize Taylor was neither pedaling abnormally fast nor riding away from the officers; thus, his departure was not indicative of evasion or flight.

Additionally, we find this situation differs considerably from *U.S. v. Lender*, 985 F.2d 151 (4th Cir.1993). While Taylor and his friend were talking in close proximity, the officers lacked the additional observation of an action by Taylor to insinuate his involvement in criminal activity. Moreover, Taylor's actions of concluding his conversation, departing from his companion, and riding his bicycle toward the officers cannot be characterized as evasive behavior to confirm Bellamy's hunch that Taylor was engaged in criminal activity. Accordingly, we distinguish this case from *Lender*. Taylor was in a close conversation, but with only one other individual, and he was in

---

with his companion, no evidence existed to confirm Bellamy's curiosity or suggest the men were positioned close together to conceal *criminal* activity. Bellamy's belief that two males engaged in a close "huddle" conversation are conducting illegal activity ninety percent of the time was not evidence that *Taylor* was engaged in criminal activity. Respectful of Bellamy's experience as a police officer and inferences drawn therefrom, he was still required to point to specific and articulable facts that, when considered in conjunction with those experiences and inferences, would reasonably warrant stopping Taylor. Furthermore, while the Dissent contends the time of day and proximity of the officers caused difficulty in observing any potential suspicious activity, especially if Taylor and his companion were attempting to conceal it, the fact remains that the officers failed to observe any activity suggesting illegality was afoot.

a high-crime area at a late hour; however, unlike Lender, Taylor exhibited no behavior suggesting criminal activity. We do not find Taylor's presence in a high-crime area at a late hour while engaged in a close conversation with another individual indicative of criminal activity.

Ultimately, we find *U.S. v. Sprinkle*, 106 F.3d 613 (4th Cir.1997), is sufficiently similar to this case and compels a finding that the officers lacked reasonable suspicion to stop Taylor. First, in both cases, the initial suspicion of illegal activity resulting from the two men's closeness was not confirmed by the officers' observations. Here, Bellamy suspected Taylor was engrossed in criminal activity after observing Taylor's close conversation with another individual; however, Bellamy stated he did not see anything pass between Taylor and his companion. Thus, Bellamy failed to observe Taylor attempt to conceal criminal activity and Bellamy's suspicions remained unsubstantiated. Second, both Sprinkle and Taylor possessed the right to depart the scene; therefore, neither engaged in evasive behavior or flight. Additionally, in both scenarios, the neighborhood was considered a high-crime area. In fact, in *Sprinkle*, Riccio's personal knowledge of Poindexter's previous narcotics violations was more specific and credible than the anonymous tipster's description of a readily observable situation in the instant case. Although we recognize the time of day in *Sprinkle* was four-and-a-half to five hours earlier than the case *sub judice*, we do not find the time of day significant enough to weigh in favor of finding Bellamy demonstrated the necessary amount of reasonable suspicion to stop Taylor.

## CONCLUSION

Mindful of our "any evidence" standard of review,[21] we find no reasonable suspicion existed for stopping Taylor. Specifically, we find Bellamy failed to articulate facts leading to the conclusion that an objective manifestation of criminal activity existed under the totality of the circumstances. Any inference of illegal activity drawn from Taylor's close proximity to his

21. *See State v. Green*, 341 S.C. 214, 219 n. 3, 532 S.E.2d 896, 898 n. 3 (Ct.App.2000) (providing an "any evidence" standard of review for search and seizure cases).

companion was dispelled by Bellamy's failure to observe anything pass between the two men or Taylor act in a way to indicate criminal activity. Additionally, the anonymous tip was substantially unreliable. Further, the high-crime nature of the area and the time of day are not in and of themselves indicative of criminal activity. Lastly, Taylor's attempted departure from his companion, by riding his bicycle toward the officers, was not attempted flight or evasive behavior because he had the right to ignore Bellamy's commands and go about his business.[22] Thus, we find Taylor's actions required either no police response or further investigation confirming Bellamy's curiosities before a forcible stop was authorized. Therefore, the admission of the drug evidence was clear error, and we reverse Taylor's conviction and vacate his sentence.[23] Accordingly, the circuit court's order is

**REVERSED.**

GEATHERS, J., concurs.

THOMAS, J., dissents in a separate opinion.

THOMAS, J., (dissenting).

I respectfully dissent. I would hold that under our standard of review, the evidence presented during the suppression hearing warrants affirming the trial judge's findings that the police had reasonable suspicion to approach and detain Taylor

---

**22.** *See Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (holding when an officer lacks reasonable suspicion or probable cause, if he approaches an individual, "the individual has a right to ignore the police and go about his business").

**23.** Due to the officers' lack of reasonable suspicion to warrant an investigatory stop, we decline to address Taylor's remaining issue on appeal regarding whether the officers had probable cause to search his tennis ball. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding when one issue is dispositive, the remaining issues need not be addressed). In any event, because Bellamy lacked reasonable suspicion to stop Taylor, any evidence acquired as a direct result of the illegal stop is inadmissible pursuant to the fruit of the poisonous tree doctrine. *See In re Jeremiah W.*, 361 S.C. 620, 624 n. 2, 606 S.E.2d 766, 768 n. 2 (2004) ("The 'fruit of the poisonous tree' doctrine holds that evidence which is produced by or directly derived from an illegal search is generally inadmissible against the defendant because of its original taint.").

as well as the right to take precautions for their own safety when he refused to cooperate. I would also affirm the trial judge's rejection of Taylor's arguments for suppressing the drugs found on his person when the police attempted to search him for weapons.

In *State v. Brockman*, 339 S.C. 57, 66, 528 S.E.2d 661, 666 (2000), the South Carolina Supreme Court set forth the standard of review for rulings in Fourth Amendment search and seizure cases: the appellate court "will review the trial court's ruling like any other factual finding and reverse if there is clear error. . . . [The appellate court] will affirm if there is any evidence to support the ruling." In holding reasonable suspicion was lacking, the majority appears to have departed from this standard in favor of relying on its own view of the totality of the circumstances in the case.

I agree a determination of reasonable suspicion requires consideration of "the totality of the circumstances—the whole picture." *U.S. v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In this State, however, this analysis of the totality of the circumstances is a function of the trial court and does not alter the deferential standard that appellate courts must observe when reviewing a trial judge's finding as to whether a Fourth Amendment violation has occurred. *See State v. Khingratsaiphon*, 352 S.C. 62, 69–70, 572 S.E.2d 456, 459–60 (2002) (adhering to the deferential standard of review, but stating that *Brockman* "does not hold the appellate court may not conduct its own review of the record to determine whether the trial judge's decision is supported by the evidence").

Using the deferential standard of review mandated by our Supreme Court, I would hold the State presented evidence during the suppression hearing to support the trial judge's finding that Officer Bellamy's decision to approach and detain Taylor was based on "specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant[ed] [the] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *quoted in State v. Lesley*, 326 S.C. 641, 643–44, 486 S.E.2d 276, 277 (Ct.App. 1997).

As the trial judge stated when denying Taylor's motion to suppress, this case involved more than an anonymous tip. There was testimony from the police officers that the location named by the tipster was a well-known drug area. Furthermore, although Taylor pedaled toward the officers when he separated from his companion, it appears undisputed that he was attempting to avoid them.

In addition, the trial judge placed great emphasis on Officer Bellamy's testimony that he observed Taylor and his companion "huddled up trying to hide something" and that, in Bellamy's experience, "[i]t's 90 percent of the time it's some sort of illegal activity going on." Although the majority acknowledged in its recitation of the facts that Officer Bellamy relied on his law enforcement experience in deciding the situation warranted detaining Taylor, it appears to dismiss his reliance on this experience and instead emphasize the fact that none of the officers at the scene saw anything pass between the two men while they were observed "huddled up." What the majority appears to overlook is that the meeting between Taylor and his companion happened late in the evening and apparently at some distance from where the officers first sighted them. This is unlike the encounter in *U.S. v. Sprinkle*, 106 F.3d 613 (4th Cir.1997), on which the majority relies. *See id.* at 616 (noting the arresting officers had "walked by the driver side" of the vehicle in which the defendant was "huddling and talking to" another individual and quoting testimony from the officers that their observations of the defendant before arresting him took place on a " 'fairly bright day' with 'plenty of light' "). Thus, whereas in Sprinkle the officers actually saw at close range and in bright light the absence of fruits or instruments of any crime, the officers in the present case could have been prevented by distance and lighting conditions from observing any suspicious activity, particularly if the subjects engaged in that activity were attempting to conceal it. Considering that the officers had less than optimal conditions to view the scene, I can fault neither Officer Bellamy for his decision to rely on his professional experience and training in determining that what he saw warranted further investigation nor the trial judge for ruling that this reliance was reasonable. Courts have allowed such reliance when reviewing probable cause determinations. *See State v.*

*Peters,* 271 S.C. 498, 504, 248 S.E.2d 475, 478 (1978) ("In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."); *State v. Davis,* 354 S.C. 348, 357, 580 S.E.2d 778, 783 (Ct.App. 2003) ("[T]he law is well settled that the officer's knowledge of general trends in criminal behavior is a relevant consideration in determining probable cause."). I see no reason not to apply a similar policy when reviewing determinations of reasonable suspicion, which require " 'less than the level of suspicion required for probable cause.' " *State v. Butler,* 343 S.C. 198, 202, 539 S.E.2d 414, 416 (Ct.App.2000) (quoting *Nebraska v. Soukharith,* 253 Neb. 310, 570 N.W.2d 344, 354 (1997)).

I would therefore follow the reasoning set forth by the Fourth Circuit Court of Appeals in *U.S. v. Lender,* 985 F.2d 151 (4th Cir.1993), which the majority has referenced but attempted to distinguish. In that case, the court, in rejecting the defendant's argument that he was unlawfully stopped by the police after officers observed him extending his hand with his palm up while talking with friends on a street corner in a poor section of town, stated that "[w]hile the defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion, an area's propensity toward criminal activity is something that an officer may consider." *Id.* at 154. The court also noted "[t]he lateness of the hour is another fact that may raise the level of suspicion." *Id.* Finally, notwithstanding the absence of evidence of drugs or other contraband at the scene, the court justified the officers' decision to approach the defendant, explaining as follows:

Additionally, the officers observed the defendant engaged in behavior that they suspected to be a drug transaction. In this neighborhood at this late time of night, a group of men was gathered around Lender looking down into his open palm. We cannot say that a reasonable police officer was required to regard such conduct as innocuous. *Even though the officers acknowledged that from their passing patrol car they could not see drugs or other contraband in the defendant's hand, the officers were not required in the absence of probable cause simply to "shrug [their] shoulders and allow a crime to occur." Because they suspected illegal*

*activity, Officers Hill and Thornell responded precisely as the law provides: they attempted to investigate further.* *Id.* (citations omitted) (emphasis added).

Because I would hold that there was evidence presented during the suppression hearing to support a finding of reasonable suspicion, I would also reject Taylor's argument that the drugs discovered by the police after they stopped him should have been excluded as the fruits of an illegal stop.

As to Taylor's other argument, that the officers did not have the legal right to intrude into the tennis ball because there was nothing inherently incriminating about it, I would hold the testimony presented during the suppression hearing supports the trial judge's finding that Officer Bellamy acted reasonably when he discovered it on Taylor's person. During the pat-down search, Officer Bellamy could determine only that the bulge in Taylor's pocket was a "hard object" that warranted further investigation to ascertain that it was not a weapon. When Officer Bellamy asked Taylor what was in his pocket, Taylor attempted to extricate himself, and Officer Bellamy managed to manipulate the object out of Taylor's pocket and onto the ground. According to Officer Bellamy, he noticed the drugs inside the tennis ball through the slit on the surface on the ball as he was picking it up from the ground. Thus, the incriminating nature of the contents of the tennis ball became apparent to the police while they were still in the process of ensuring Taylor was not armed. *See State v. Abrams,* 322 S.C. 286, 288, 471 S.E.2d 716, 717 (Ct.App.1996) (holding that once the police discovered the defendant was not armed, "they could not carry the intrusiveness of their search further unless the incriminating character of the object discovered during the search was immediately apparent to the officer performing the pat-down"). Nothing in Officer Bellamy's testimony suggested that he squeezed the ball for any purpose other than to pick it up off the ground. Moreover, it was as he was picking up the ball that he noticed the drugs inside it through the slit on the surface.

For the foregoing reasons, I would affirm the trial judge's denial of Taylor's motion to suppress the drug evidence offered by the State against him and would likewise affirm his conviction.