736 S.E.2d 663

The **STATE** of South Carolina, Petitioner,

v.

**Syllester D. TAYLOR, Respondent.**

No. 27207.

Supreme Court of South Carolina.

Heard Nov. 2, 2011.

Decided Jan. 9, 2013.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley E. Elliott, and Assistant Attorney General Christina J. Catoe, all of Columbia, and Solicitor Edgar Lewis Clements, III, of Florence, for Petitioner.

Appellate Defender Robert M. Pachak, of South Carolina Commission on Indigent Defense, of Columbia, for Respondent.

Chief Justice TOAL.

The State contests the court of appeals' decision holding the police search and seizure of Syllester Taylor (Respondent) improper under the Fourth Amendment to the United States Constitution.[1]  We reverse.

### Facts/Procedural History

On July 25, 2006, at approximately 11:00 p.m., the Florence County Sheriff's Office received a dispatch regarding suspected drug activity.  The anonymous call indicated that a black male on a bicycle appeared to be selling drugs in an area well known to law enforcement for its high incidence of crime and drug traffic.  Sheriff's deputies responded to the call and, from their vehicles, observed Respondent alone at a road intersection.  Respondent is an African–American male and

---

1. U.S. Const. amend. IV.

was on a bicycle. The officers parked their vehicles and approached Respondent's position on foot. Officers then observed Respondent "huddled up" with another male. Suspecting an illegal drug transaction, officers approached Respondent. Upon realizing that the officers were approaching, Respondent and his associate "immediately" split up, and Respondent rode the bicycle towards the officers in an apparent attempt to flee the area. Police called out to Respondent to stop, but Respondent continued his movement. Believing that he had reasonable suspicion under the circumstances, an officer conducted a takedown of Respondent and patted him down for weapons. During the search for weapons the deputy discovered crack cocaine.

Respondent was indicted for possession with intent to distribute crack cocaine. The case proceeded to trial, and the sheriff's deputy that conducted the search testified *in camera* regarding the discovery of the crack cocaine:

I then push [sic] the subject to the top of his pocket without entering the pocket. It rolled out on the ground beside him with [sic] a green tennis ball. At the time, I picked the tennis ball up. As I picked it up, I squeezed it. It had a slit in the top of it. And inside the tennis ball, you could actually see the bag of what was believed to be crack cocaine at the time.

The officer later testified during the trial:

I worked the item up until it dropped out on the ground beside him. I picked the object up. It was a green tennis ball. It did have a cut in the top of it. And as I pick the ball up, I could see the plastic bag what appeared to this deputy to be crack cocaine inside.

Respondent was found guilty and sentenced, as a third-time drug offender, to thirty years' imprisonment. The court of appeals overturned the conviction, finding that police did not have reasonable suspicion to stop Respondent. *State v. Taylor*, 388 S.C. 101, 694 S.E.2d 60 (Ct.App.2010). The State sought review of this decision, and this Court granted certiorari.

## Issues Presented

I.  Whether police had reasonable suspicion to detain Respondent and conduct an investigatory search.

II. Whether police had probable cause to search the tennis ball discovered during the search of Respondent.

## Standard of Review

■ A trial court's Fourth Amendment suppression ruling must be affirmed if supported by any evidence, and an appellate court may reverse only when there is clear error. *State v. Groome*, 378 S.C. 615, 618, 664 S.E.2d 460, 461 (2008).

## Law/Analysis

### I. Whether police had reasonable suspicion to detain Respondent and conduct an investigatory search.

■ The State argues the court of appeals erred in reversing Respondent's conviction. We agree. Under the totality of the circumstances, officers had reasonable suspicion to conduct an investigatory stop.

■ An investigative detention is constitutional if supported "by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). The required reasonable suspicion can arise from an anonymous tip provided that the totality of the surrounding circumstances justifies acting on the tip. *United States v. Perrin*, 45 F.3d 869, 871 (4th Cir.1995). Courts must look at the cumulative information available to the officer . . . and not find a stop unjustified based merely on a "piecemeal refutation of each individual fact and inference." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir.2008). "Just as one corner of a picture might not reveal the picture's subject or nature, each component that contributes to reasonable suspicion might not alone give rise to reasonable suspicion." *United States v. Mason*, 628 F.3d 123, 129 (4th Cir.2010).

Two cases decided by the United States Court of Appeals for the Fourth Circuit, *United States v. Lender*, 985 F.2d 151 (4th Cir.1993), and *United States v. Sprinkle*, 106 F.3d 613 (4th Cir.1997), are instructive.

In *Lender*, at approximately 12:50 a.m., officers observed four to five men, including the defendant, huddled together in

an area known for heavy drug traffic. *Lender*, 985 F.2d at 153. The defendant had his hand stuck out with his palm up, and the other men were looking down toward his palm. *Id.* Suspecting a drug transaction, the officers stopped their car, got out, and approached the men. *Id.* As the officers approached, the group began to disperse, and the defendant walked away from the officers with his back to them. *Id.* The officers called out for the defendant to stop, but he refused. After the officers again called out for defendant to stop, he did, and a semi-automatic pistol fell from his waist to the ground. *Id.* The officers subdued the defendant and placed him under arrest for carrying a concealed weapon. *Id.* The defendant was eventually indicted for one count of possessing a firearm after having been convicted of a crime punishable by a term exceeding one year. *Id.* at 153.

The defendant moved to suppress the gun on the grounds that it had been discovered after police unlawfully seized him. *Id.* He argued that the officers had no reasonable suspicion to justify stopping him, and that he was seized from the moment he came to a stop after the officers' second call for him to do so. *Id.* The district court denied the motion, finding that although the officers had no reasonable suspicion to stop the defendant, he had not been seized at the time the gun fell into plain view. *Id.*

The Fourth Circuit disagreed:

Here the officers personally knew that the area they were patrolling had a large amount of drug traffic. While the defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion, an area's propensity toward criminal activity is something an officer may consider. Additionally, the officers observed the defendant engaged in behavior that they suspected to be a drug transaction.... We cannot say that a reasonable police officer was required to regard such conduct as innocuous.... [T]he officers were not required in the absence of probable cause simply to "shrug their shoulders and allow a crime to occur."

*Id.* at 154 (citation omitted).

The court explicitly addressed the defendant's attempt to flee the scene:

When the officers tried to approach Lender, he attempted to evade them by turning his back and walking away. Evasive conduct, although stopping short of headlong flight, may inform an officer's appraisal of a street corner encounter. Given the factors present here, we think Officer Hill had reasonable suspicion to stop the defendant.

*Id.* (citation omitted).

In *Sprinkle,* the Fourth Circuit found that police did not have reasonable suspicion to justify an investigative stop. *Sprinkle,* 106 F.3d at 619. Police officers observed Victor Poindexter sitting in the driver's seat of a vehicle parked directly across the street from their position. *Id.* at 615. It was 5:30 p.m. on a "fairly bright day" with "plenty of light." Police knew that Poindexter had served time for narcotics violations, but had no reports of any criminal activity by Poindexter since his release. *Id.* at 615–16. The street where Poindexter was parked was in a neighborhood known by police for considerable narcotics trafficking, and one of the officers had personally made numerous drug arrests in the area. *Id.* at 616.

A few seconds after police began observing Poindexter, the officers saw Carl Sprinkle get in the passenger side of the vehicle. *Id.* The officers then walked by the driver side of the car and noticed Sprinkle and Poindexter "huddled to the center of the console of the vehicle," with their hands "close together." *Id.* The officers believed that Sprinkle was passing or about to pass something to Poindexter, and when Poindexter saw police he "put his head down and put his hand to the left side of his face as if to conceal his face. . . ." *Id.* Police later testified that they could see inside the car, and "everybody's hands," and yet did not see any drugs, money, guns, or drug paraphernalia. *Id.*

Shortly thereafter, Poindexter started the car and pulled onto the street. He drove in a normal, unsuspicious fashion; he did not speed, drive erratically, or commit any traffic violations. *Id.* After driving only 150 feet, an unrelated traffic stop completely blocked Poindexter's way, and police activated their blue lights. *Id.* Sprinkle stepped out of the car and ran away as police attempted to initiate a pat-down search. *Id.* As officers pursued him, Sprinkle pulled out a handgun which was

later recovered by police. *Id.* Sprinkle was then indicted for possessing a firearm after conviction for a felony. Sprinkle moved to suppress evidence of the gun as the product of an unlawful stop. *Id.* The district court granted Sprinkle's motion to suppress, concluding that officers did not have a "reasonable articulable suspicion" to justify the stop. *Id.*

The government appealed, arguing that five facts, taken together, provided police the basis for a reasonable suspicion of criminal activity; (1) knowledge that Poindexter had a criminal record for narcotics violations, (2) the subjects were spotted in a neighborhood known for high crime, (3) the two men huddled toward the vehicle's center console with their hands close together, (4) Poindexter tried to place his hands close to his face in order to avoid recognition, and (5) Poindexter drove away as soon as officers walked by the car. *Id.* at 616–17. The government also relied heavily on the court's previous opinion in *Lender*. *Id.* at 619 n. 3. The court distinguished the facts of *Lender* from those of *Sprinkle* in rejecting the government's argument:

> Several factors distinguish *Lender*. First, although police could not see into Lender's open hand, the fact that several men were looking into his hand indicated there was actually something in it. Here, although Poindexter and Sprinkle had their hands close together, [police] were able to see that their hands appeared empty. Thus . . . initial suspicion that Sprinkle was about to pass something to Poindexter was simply not confirmed by what [police] actually saw. Second, Lender engaged in what we considered evasive conduct when he turned his back on approaching officers and walked away. Here the district court found that Poindexter was not being evasive. Third, in *Lender* we determined that the lateness of the hour (1:00 a.m.) properly contributed to reasonable suspicion. Poindexter was parked in broad daylight on a busy street with people all around. In sum, *Lender* is distinguishable to the point that it is not controlling.

*Id.*

The circumstances of the instant case closely mirror the facts of *Lender*. Police received an anonymous tip that a black male, on a bicycle, was possibly selling "dope" at an

unpaved portion of a local street known for a high incidence of drug traffic. At approximately 11:00 p.m., police officers observed Respondent, an African–American male, on a bicycle in this same area. Respondent was "huddled up" with another male. Police testified that according to past experience, "ninety percent of the time," this sort of behavior indicated the presence of illegal activity. Unlike the scenario in *Sprinkle*, the Record does not reflect that police were unable to observe Respondent's hands, and thus nothing contradicted their suspicion that illegal activity was taking place. As the officers approached, Respondent pedaled toward them in an undisputed attempt to avoid them.[2] Evasive conduct may inform an officer's appraisal of a street corner encounter. *Lender*, 985 F.2d at 154 (citing *United States v. Sharpe*, 470 U.S. 675, 683 n. 3, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). Given the totality of the circumstances, it was proper for police to conduct a pat down of Respondent. The officers in this case suspected illegal activity and established law does not require them to simply "shrug their shoulders and allow a crime to occur." *Id.*

In the instant case, the court of appeals explained why each individual circumstance could not provide a basis for reasonable suspicion. *State v. Taylor*, 388 S.C. 101, 119–20, 694 S.E.2d 60, 69–70 (2010). This approach directly contravenes the principles underlying a totality of the circumstances analysis. Courts may not find a stop unjustified based merely on a piecemeal refutation of each individual fact and inference. *United States v. Whitehead*, 849 F.2d 849, 858 (4th Cir.1988), *abrogated on other grounds by Gozlon–Peretz v. United States*, 498 U.S. 395, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991). Moreover, the court of appeals held that the officers were present at the scene "based solely on the anonymous and unreliable tip and made no supplemental observations suggesting any illegal activity was afoot." *Taylor*, 388 S.C. at 120, 694 S.E.2d at 70. This view of the facts ignores the testimony of the officers regarding their observations, and the

---

2. According to the officer's testimony, police observed Respondent in an isolated and unpaved portion of the street. The road leads to a "dead end" wooded area and intersects with another unpaved road. It is most likely that Respondent would have had to pedal towards the officers in order to avoid them and remain on the bicycle.

well-settled principle that courts must give due weight to common sense judgments reached by officers in light of their experience and training. *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir.2004).

■ Therefore we hold that the court of appeals erred in finding that police did not have reasonable suspicion to justify an investigatory stop of Respondent. Our appellate courts must only reverse where there is *clear* error, and in this case sufficient evidence in the Record supported the trial court's conclusion.

Having found that police lawfully stopped Respondent, we now turn to whether police lawfully seized the drug evidence in this case.

## II. Whether police had probable cause to search the tennis ball discovered during the search of Respondent.

■ Respondent argues that police lacked probable cause to search the tennis ball in his possession "when there was nothing inherently incriminating about the tennis ball," and that the officer's initial frisk removed any concern that weapons were present. We hold that the police officer's conduct did not exceed the constitutionally permissible scope of a pat-down search as explained by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

In *Terry*, the Supreme Court explained the contours of a search based on reasonable suspicion:

We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an

attempt to discover weapons which might be used to assault him.

*Terry,* 392 U.S. at 30, 88 S.Ct. 1868.

In *Dickerson,* the Supreme Court granted certiorari to resolve a conflict among state and federal courts over whether contraband detected through the sense of touch during a pat down search could be admitted into evidence. *Dickerson,* 508 U.S. at 370, 113 S.Ct. 2130. This case controls our analysis of the instant case, and thus a brief recitation of the facts and analysis is necessary.

In that case, two police officers patrolling in a marked squad car observed Dickerson leaving an apartment building. *Id.* at 368, 113 S.Ct. 2130. The officers, having responded to complaints of drug sales in the building, considered it to be a notorious "crack house." *Id.* Dickerson began walking toward police, but upon spotting the officers, abruptly halted and began walking in the opposite direction. *Id.* at 368–69, 113 S.Ct. 2130. Based on this seemingly evasive action and the fact that he had just left a building known for cocaine traffic, the officers decided to stop Dickerson and investigate further. *Id.* at 369, 113 S.Ct. 2130. The officers ordered Dickerson to stop and submit to a pat-down search. *Id.* The search revealed no weapons, but one of the officers conducting the search took an interest in a small lump in Dickerson's nylon jacket. *Id.* The officer later testified, "As I pat-searched the front of his body, I felt a lump, a small lump, in the front pocket. I examined it with my fingers and it slid and it felt to be a lump of crack cocaine in cellophane." *Id.* The officer then reached into Dickerson's pocket and retrieved a small plastic bag containing one fifth of one gram of crack cocaine. *Id.*

The Supreme Court analogized the facts of *Dickerson* to those of *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). In *Hicks,* the Supreme Court invalidated the seizure of stolen stereo equipment found by police while executing a valid search for other evidence. *Id.* at 327–29, 107 S.Ct. 1149. Although police were lawfully on the premises, they obtained probable cause to believe that the stereo equipment was contraband only after moving the equipment to permit officers to read its serial numbers. *Id.* at 323–24, 107

S.Ct. 1149. Thus, the incriminating character of the stereo equipment was not immediately apparent; rather, probable cause to believe that the equipment was stolen arose only as a result of a further search—the moving of the equipment—that was not authorized by the search warrant. *Id.* at 325–27, 107 S.Ct. 1149.

In *Dickerson,* the officer was in the lawful position to feel the lump in Dickerson's pocket. *Dickerson,* 508 U.S. at 379, 113 S.Ct. 2130. However, the officer determined the item was contraband only after conducting a further search. The Supreme Court held that this further search was not authorized by *Terry* or by any other exception to the warrant requirement. *Id.* Because this further search was constitutionally invalid, the seizure of the cocaine was likewise unconstitutional. *Id.*

The police officer's conduct in the case presently before us is not similar to that found in *Dickerson,* and did not exceed the constitutionally permissible scope of a pat-down search. Here, the officer testified regarding his impressions and Respondent's behavior at the time of the search:

> After having the subject down, he was explain [sic]—I explain to the subject why he was being detained. . . . [T]he whole time he was trying to wriggle free stating that he didn't do it. At that time, I then patted his right hand pocket and could feel a large bulge in his pocket. It was unknown at this time . . . if it was a weapon or what. I then explain to him that he was—the whole purpose of stopping to [sic] him start with because the whole time he was asking why you stopping me. At that time he started wiggling trying to break free. At that time, due to the fact that he did have a large item in his pocket this deputy thought it might have been some sort of a weapon.

The officer initially testified *in camera* regarding his search of Respondent and subsequent discovery of crack cocaine:

> I then push [sic] the subject to the top of his pocket without entering the pocket. It rolled out on the ground beside him with [sic] a green tennis ball. At the time, I picked the tennis ball up. As I picked it up, I squeezed it. It had a slit in the top of it. And inside the tennis ball, you could

actually see the bag of what was believed to be crack cocaine at the time.

The officer later testified during the trial:

I worked the item up until it dropped out on the ground beside him. I picked the object up. It was a green tennis ball. It did have a cut in the top of it. And as I pick the ball up, I could see the plastic bag what appeared to this deputy to be crack cocaine inside.

It is clear from the officer's statements that he had not yet determined whether Respondent had a weapon when he manipulated the tennis ball out of Respondent's pocket. The officer then noticed the drugs inside the tennis ball through a slit on its surface as he squeezed the tennis ball when he picked it up from the ground. Thus, the incriminating nature of the contents of the tennis ball became apparent while police were still in the process of ensuring that Respondent was unarmed. *See Taylor*, 388 S.C. at 128, 694 S.E.2d at 74 (Thomas, J., dissenting). The tennis ball could have easily contained a razor, or other sharp object, which could be used alone or in conjunction with the tennis ball as a handle. Moreover, unlike the sequence of events in *Dickerson*, nothing in the record indicates that the police officer in the instant case manipulated the tennis ball any more than was necessary in order to pick it up from the ground.[3]

---

3. The facts and analysis of *State v. Scott*, 518 N.W.2d 347 (Iowa 1994), are illuminating. In that case, police stopped a vehicle carrying the defendant due to reports that the vehicle recently left an area where gunshots had been fired. *Id.* at 348. A police officer conducted a pat-down search of the defendant's outer clothing and felt an object that she thought was narcotics. *Id.* at 349. The police officer knew that the object was not a weapon, and asked the defendant what he had in his pocket. *Id.* The defendant replied, "I don't want no trouble, I ain't going to lie, it's marijuana." *Id.* The defendant later sought to suppress the drug evidence. *Id.* The trial court concluded that the seizure of the marijuana exceeded the scope of a *Terry* stop because the police officer asked the defendant to identify the object. *Id.* The Iowa Supreme Court held that asking the defendant a question did not constitute a search and thus did not exceed the scope of an investigatory stop and weapons search. *Id.* at 350. The instant case presents an analogous situation. There is little difference between an officer questioning a suspect as to the nature of an object, and merely picking up an object that falls to the ground. The officer's alleged manipulation or "squeezing" of the tennis ball involved nothing more than was needed to retrieve it from

We greatly respect the perspective of the concurring and dissenting views in this case. However, we simply disagree on the contours and limitations of the Fourth Amendment. In our view, Respondent urges this Court to adopt a rule that will potentially lead to unintended results. Simply put, if police officers execute a valid pat-down search, and an object which is not facially incriminating falls to the ground, any drug evidence that results from the police officer no more than retrieving that object from the ground must be suppressed. It cannot be the case that *Dickerson* requires this conclusion, and thus, the trial court properly admitted the evidence seized by police.

**REVERSED.**

HEARN, J., and Acting Justice JAMES E. MOORE, concur.

BEATTY, J., dissenting in a separate opinion.

KITTREDGE, J. concurring in part and dissenting in part in a separate opinion.

Justice BEATTY.

I dissent. I would affirm the well-reasoned opinion of Judge Short. In my view the majority's opinion eviscerates the constitutional protection of the Fourth Amendment to the United States Constitution and Article 1, section 10 of the South Carolina Constitution. This record is totally devoid of any facts that would legally justify the stop, let alone the search.

The unadulterated facts are these: The police receive an unreliable *anonymous* tip of a man on a bicycle *possibly* selling drugs. A policeman initially observes a cyclist riding his bicycle and subsequently observes him stationary and talking to another male. The policeman does not observe any indication of illegal activity. The two men notice the policeman and discontinue their conversation and proceed to leave. The cyclist pedals toward the policeman, the policeman tells him to stop, the cyclist doesn't obey, and the policeman takes

the ground, and did not constitute an impermissible search of Respondent.

the cyclist to the ground and proceeds to search him. These actions take place in a minority neighborhood in Florence.

It is significant that the policeman could not articulate any *legally acceptable* suspicion of criminal activity. Two black men holding a conversation in their neighborhood is insufficient to support a *Terry v. Ohio*[4] stop and frisk, even if the neighborhood is branded a "drug area." *United States v. Sprinkle*, 106 F.3d 613 (4th Cir.1997). Absent articulable, reasonable suspicion of criminal activity, the police had no right to stop the cyclist and the cyclist had no obligation to stop when told to do so by the policeman. *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

I would affirm.

Justice KITTREDGE.

I concur in part and dissent in part. While I concur that law enforcement had reasonable suspicion to detain Respondent Syllester D. Taylor and conduct a *Terry*[5] investigatory stop,[6] I believe the officer's manipulation of the tennis ball exceeded the parameters of the Fourth Amendment as interpreted in *Minnesota v. Dickerson.*[7] I would affirm the court of appeals in result.

Deputies of the Florence County Sheriff's Office were dispatched to investigate an anonymous tip of an individual "possibly selling dope." The underlying facts, which amply support the trial court's finding of reasonable suspicion, are set forth in the majority opinion. *State v. Brockman,* 339 S.C. 57, 64–65, 528 S.E.2d 661, 664–65 (2000). "Our review in Fourth Amendment search and seizure cases is limited to determining whether any evidence supports the trial court's finding." *State v. Banda,* 371 S.C. 245, 251, 639 S.E.2d 36, 39 (2006). "The appellate court may only reverse where there is

---

4. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)

5. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

6. I join Judge Thomas' well-reasoned analysis, as she properly applied the correct standard of review. *See State v. Taylor,* 388 S.C. 101, 124–28, 694 S.E.2d 60, 72–74 (Ct.App.2010) (Thomas, J., dissenting).

7. 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

clear error." *State v. Pichardo*, 367 S.C. 84, 95, 623 S.E.2d 840, 846 (Ct.App.2005).

"Even where the stop is deemed proper, 'before the police may frisk a defendant, they must have a reasonable belief the defendant is armed and dangerous.'" *State v. Blassingame*, 338 S.C. 240, 248, 525 S.E.2d 535, 540 (Ct.App.1999) (quoting *State v. Fowler*, 322 S.C. 263, 267, 471 S.E.2d 706, 708 (Ct.App.1996)). "The purpose of this limited search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). "In assessing whether a suspect is armed and dangerous, the officer need not be absolutely certain the individual is armed." *Blassingame*, 338 S.C. at 248–49, 525 S.E.2d at 540. "The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* "Whether a Fourth Amendment violation has occurred turns on an objective assessment of [an officer's] actions in light of the facts and circumstances confronting him at the time and not on the officer's actual state of mind at the time the challenged action was taken." *United States v. Swann*, 149 F.3d 271, 276 (4th Cir.1998) (internal quotations omitted) (finding it was objectively reasonable for officers' suspicion to be aroused by a hard rectangular object which was approximately the same size and shape as a box cutter with a sharp blade and was found in a suspect's sock).[8] There exists an indisputable nexus between drugs and guns, and where an officer has reasonable suspicion that drugs are present, there is an appropriate level of suspicion of criminal activity and apprehension of danger to justify a frisk. *Banda*, 371 S.C. at 253, 639 S.E.2d at 40.

Police officers may seize non-threatening contraband detected during a protective pat-down search permitted by *Terry* so long as the "contour or mass [of the object] makes its identity *immediately apparent.*" *Dickerson*, 508 U.S. at 373–75, 113 S.Ct. 2130 (emphasis added). "Once an officer has determined

---

8. Notably, the United States Court of Appeals for the Fourth Circuit stated, "[a] similarly shaped hard object *in Swann's pocket* certainly would have raised no alarms, as there could be innumerable innocent explanations for it." *Swann*, 149 F.3d at 276 (emphasis added).

that the object is not a weapon, however, and if its shape or size does not indicate its contraband nature, *the search must stop." United States v. Raymond,* 152 F.3d 309, 312 (4th Cir.1998) (emphasis added). Where an officer first believes a hard object under a person's outer clothing is a gun, but during the course of removing it, becomes aware that it is not a weapon, but rather is an object whose incriminating nature was immediately apparent, the pat-down does not constitute an unreasonable search. *Id.* at 313 (finding search was reasonable where officer initially thought hard object was a weapon but, upon pulling it from the suspect's waistband, "immediately realized from the shape of the object and his experience on the force that it was a crack cookie").

In the present case, as part of the valid investigatory detention, and for officer safety, a deputy conducted a pat-down of Respondent. The deputy felt a hard bulge in Respondent's right pants pocket. The deputy testified he believed the object could have been a weapon, and he pushed the object to the top of Respondent's pocket without reaching inside the pocket. The object fell from Respondent's pocket and rolled on the ground. It was a tennis ball, as the deputy testified: "It rolled out on the ground beside him with [sic] a green tennis ball. At that time, I picked the tennis ball up. As I picked it up, *I squeezed it.* It had a slit in the top of it. And inside of the tennis ball, you could actually see the bag of what was believed to be crack cocaine at the time." (emphasis added).[9] Significantly, the record contains not a scintilla of evidence that the deputy harbored any belief that the tennis ball, once identified, was a weapon. This undisputed fact belies the majority's effort to find that "the incriminating contents of the tennis ball became apparent while police were still in the process of ensuring that Respondent was unarmed."[10]

---

9. The deputy's testimony before the jury was similar. The deputy stated the tennis ball "has a split in it and [Respondent] could get what he needed in and out of it." When questioned whether the drugs were "difficult to see when you squeezed it," the deputy answered, "No, sir, once you pick the ball up, just the little bit of pressure open [sic] the slit up so that you could see what was inside."

10. Moreover, it may be common (for purposes of meeting the "immediately apparent" standard) for drug dealers to secrete drugs in objects

Although the deputy could lawfully remove the hard object from Respondent's pocket to ensure that it was not a weapon, the law does not allow a further search or manipulation of the object when it is clearly not a weapon and its incriminating nature is not immediately apparent. Under *Minnesota v. Dickerson*,[11] once the tennis ball was removed from Respondent's pocket and determined to be an object whose incriminating character was not immediately apparent, the deputy was not permitted to squeeze or manipulate the tennis ball to discover contraband that was hidden inside. Consequently, the deputy exceeded the limited scope of the pat-down search authorized by *Terry* when he squeezed the tennis ball and looked inside the slit to discover the drugs. *See also United States v. Askew*, 529 F.3d 1119, 1146 (D.C.Cir.2008) (finding police officer's partial unzipping and opening of the defendant's jacket was a search under the Fourth Amendment and observing that "*Terry* allows an identification *seizure*. It does not permit an identification *search*."); *United States v. Miles*, 247 F.3d 1009, 1013 (9th Cir.2007) (finding a search following a *Terry* stop invalid under the Fourth Amendment where the officer exceeded a permissible pat-down for weapons by "moving or shaking" a small box in defendant's pocket).

Because I believe the deputy's manipulation and search of the tennis ball was impermissible under the Fourth Amendment and the very sort of evidentiary search that *Terry* expressly refused to authorize, I would affirm the court of appeals in result concerning the suppression of the evidence.

---

such as a tennis ball, but there is no evidence in this record to support such a finding.

**11.** *Dickerson* provides an example of an impermissible search where the officer "squeeze[ed], slid[ ], and otherwise manipulate[ed] the contents of the defendant's pocket." 508 U.S. at 378, 113 S.Ct. 2130. The United States Supreme Court found that the officer "overstepped [the] bounds of the 'strictly circumscribed' search for weapons allowed under Terry" with the "continued exploration of [defendant's] pocket after having concluded that it contained no weapon." *Id.*