# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Stepheno Jemain Alston, Petitioner.

Appellate Case No. 2015-002134

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Spartanburg County
J. Derham Cole, Circuit Court Judge

---

Opinion No. 27774
Heard December 14, 2016 – Filed March 7, 2018

---

## AFFIRMED AS MODIFIED

---

Appellate Defender Lara Mary Caudy, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson and Assistant Attorney General Mark Reynolds Farthing, both of Columbia; and Solicitor Barry Joe Barnette, of Spartanburg, all for Respondent.

---

**CHIEF JUSTICE BEATTY:** Stepheno Jemain Alston was tried *in absentia* and convicted by a jury of trafficking in cocaine. The trial judge sentenced Alston to twenty-five years' imprisonment. On appeal, the Court of Appeals affirmed Alston's conviction and sentence. *State v. Alston*, Op. No. 2015-UP-381 (S.C. Ct. App. filed July 29, 2015). In so ruling, the Court of Appeals upheld the trial judge's denial of Alston's motion to suppress evidence found in his vehicle following a traffic stop. Specifically, the Court of Appeals agreed with the trial judge that: (1) the arresting officer had (a) probable cause to stop Alston's vehicle for a violation of South Carolina's failure to maintain a lane statute[1] and (b) reasonable suspicion to support a brief investigatory detention; (2) the officer had reasonable suspicion that illegal activity was occurring to justify extending the duration of the traffic stop; and (3) Alston voluntarily gave his consent to the officer to search his vehicle. This Court granted Alston's petition for a writ of certiorari to review the decision of the Court of Appeals. We affirm as modified.

## I.      Factual / Procedural History

On March 28, 2011, Deputy Donnie Gilbert, employed with the Interstate Criminal Enforcement Team of the Spartanburg County Sheriff's Office, was monitoring traffic on northbound Interstate 85. At approximately 1:00 p.m., Deputy Gilbert observed a green Hyundai Santa Fe pass him while continuing to strike the dotted lines of its lane of travel. According to Deputy Gilbert, the vehicle was traveling in the middle lane of the three-lane interstate. He further explained that:

> [the vehicle's] left side tire struck the dotted line that divides the middle lane, which [the vehicle] was traveling in, and the fast lane, which would've been to [the vehicle's] left. Then [the vehicle] drifted back

---

[1] Section 56-5-1900 provides in relevant part:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
>
> > A vehicle *shall be driven as nearly as practicable entirely within a single lane* and shall not be moved from the lane until the driver has first ascertained that such movement can be made with safety.

S.C. Code Ann. § 56-5-1900(a) (2006) (emphasis added).

into the middle of that middle lane.  And [the vehicle] did that several times in the time that it took me to catch up to the vehicle.

Based on this observation, Deputy Gilbert pursued the vehicle and initiated a traffic stop.  At this time, Deputy Gilbert activated his in-dash video camera and called in the license plate number of the vehicle to the Sheriff's Office.

Deputy Gilbert testified that, as he approached the vehicle, he noticed what appeared to be luggage covered by a blanket in the rear cargo area of the small SUV. Deputy Gilbert further stated that when he approached the passenger side window, the driver immediately asked him why he was being stopped.  Deputy Gilbert then requested the driver's license, which identified the driver as Alston who resided in Rome, Georgia.  In the audio recording, Deputy Gilbert can be heard explaining to Alston that he observed Alston's vehicle drift "several times" and then asking Alston whether he was under the influence of any drugs or alcohol or was too tired to drive. Deputy Gilbert explained that it was his responsibility to ensure that Alston was not under the influence of anything.

When Deputy Gilbert requested the vehicle's paperwork, Alston produced a rental agreement in the name of Tamisha Harris, Alston's girlfriend.  The agreement indicated that Harris had rented the vehicle in Cartersville, Georgia, an area outside of Atlanta, on March 26, 2011, and was required to return it on April 2, 2011. According to the terms of the agreement, the vehicle was authorized to be operated only in Georgia, Tennessee, Kentucky, Virginia, and West Virginia.[2]

Approximately two minutes later, Deputy Gilbert asked Alston to exit the vehicle.  As Alston complied, Deputy Gilbert noticed a "household air freshener" in the driver's door pocket.  When Deputy Gilbert questioned Alston about his travel plans, Alston relayed that he was on his way to New Jersey to visit his mother and bring her back to Georgia for Mother's Day.  Alston also told Deputy Gilbert he was concerned for his mother's health and wanted to check on her, and planned to stay in New Jersey for about a week.  Deputy Gilbert testified he specifically asked Alston if he planned to stay in New Jersey until the following Monday, April 2, 2011, the date the vehicle was to be returned, and Alston replied in the affirmative.

Deputy Gilbert continued to question Alston while he contacted the Spartanburg County Sheriff's Office to run a check on Alston's license.

---

[2]  The agreement also indicates that Harris paid $10 a day to authorize another driver, which she identified as Alston.

Approximately six and a half minutes after the traffic stop, Deputy Gilbert entered his patrol car and placed a call to request that the K-9 unit be brought to the site of the traffic stop. Shortly thereafter, Deputy Gilbert exited the patrol car and began writing a warning citation.

While writing the warning and waiting for a response on the license check, Deputy Gilbert questioned Alston further about his family and employment. Alston told Deputy Gilbert that he owned a clothing store in Rome, Georgia, and he had six children. Deputy Gilbert testified that, when asked how old his children were, Alston recited seven numbers.[3] Deputy Gilbert further stated Alston initially claimed his license had never been suspended, however, after dispatch indicated to the contrary, Alston admitted it had previously been suspended. Approximately fourteen minutes into the traffic stop, Deputy Gilbert was able to confirm that Alston's license was valid and there were no issues with the vehicle's paperwork or tag.

During the course of the stop, Deputy Gilbert managed to call for a backup officer; however, dispatch informed him that the officer "wasn't necessarily in the same area as [Deputy Gilbert]." Deputy Gilbert testified he intended to ask Alston for consent to search the vehicle but waited, for safety reasons, until another officer arrived at the scene. Approximately fifteen minutes after the traffic stop, the video recording shows that Deputy Gilbert completed the warning and pulled the paper off of a pad.[4]

Shortly thereafter, Deputy Gilbert asked Alston for consent to search the vehicle. Alston replied, "I'm just trying to figure all - - what all this is about." In response, Deputy Gilbert advised he was simply asking a question, at which point Alston said "I mean, yeah, you can search it." Deputy Gilbert further testified that he advised Alston of his right to refuse consent, but Alston had "already told [him] 'yes'." The search of the vehicle yielded 434 grams of cocaine hidden in the steering column.[5]

---

[3] During the sentencing hearing, Alston's counsel informed the trial judge that Alston has seven children.

[4] Deputy Gilbert never gave Alston the warning or returned his paperwork.

[5] In addition to luggage, a backpack, and some other items, the officers discovered a knife in the center console of the vehicle.

Subsequently, a Spartanburg County grand jury indicted Alston for trafficking in cocaine. A jury tried Alston *in absentia*. At the beginning of the trial, Alston's counsel moved to suppress the evidence.

During the pre-trial hearing, Deputy Gilbert recounted the details of the traffic stop and explained that, based on his more than eleven years' experience, the following factors provided him with reasonable suspicion that Alston was involved in criminal activity: (1) Alston's luggage was covered by a blanket, which suggested an intent to divert attention to the luggage and away from the steering column; (2) Alston, unlike ninety-nine percent of other drivers who are pulled over, immediately asked why he was being stopped rather than wait for the officer's explanation; (3) Alston was from outside of Atlanta, a "major hub for criminal activity in the southeast"; (4) Alston was driving on Interstate 85, which is "a major criminal activity corridor connecting Atlanta to many routes to the south and to the north"; (5) the vehicle was rented to a third party who was not present; (6) the vehicle was rented to a female, which is common for "drug trafficking organizations" because they do not think that law enforcement "recognize[s] criminal activity with a female"; (7) the vehicle was being driven in South Carolina and Alston stated he was driving to New Jersey, yet neither were identified as authorized states on the rental agreement; (8) Alston had a "household air freshener" in the vehicle, which can be "used as a masking agent to hide odors of other things, which could be drugs"; (9) house keys were placed on the rental key ring, which may have been an attempt to "personalize the vehicle"; (10) Alston's stated travel plans did not comport with the terms of the rental agreement as he would be arriving in Georgia after the vehicle was due; (11) Alston stated he intended to pick up his mother for Mother's Day, but Mother's Day, was a month and a half away; and (12) Alston stated he had six children but gave the ages for seven children when asked.

After Deputy Gilbert's testimony, Alston's counsel moved to suppress the evidence. As a threshold matter, counsel argued the initial stop was invalid because Alston was merely trying to allow maximum distance between himself and the officer's parked vehicle on the side of the road. Counsel then asserted that Deputy Gilbert lacked reasonable suspicion to extend the traffic stop beyond the time necessary to write the warning citation and, as a result, the vehicle and Alston were illegally seized in violation of the Fourth Amendment. Counsel also noted that Deputy Gilbert "was unable to articulate any specific crime or any specific criminal activity that [Alston] was involved in." Further, counsel maintained that "there was no valid consent" and even if there was consent, "it was obtained by prolonged detention."

The trial judge took the motion under advisement to review the recording of the traffic stop. The next day, the judge denied Alston's motion to suppress, ruling:

> I find that the stop made by the officer was pursuant to a valid traffic stop, that it was based on probable cause, that the detention resulting from that stop was based upon the totality of the circumstances as presented by the evidence in this case, was reasonable under the Fourth Amendment and that the search made of the vehicle which resulted in the seizure of evidence to be used in the trial against him was based upon consent and in this case with actual knowledge of his right to refuse consent.

Ultimately, the jury convicted Alston of trafficking in cocaine. Six months later, the trial judge opened the sealed sentence and sentenced Alston to twenty-five years' imprisonment.

Alston appealed his conviction and sentence to the Court of Appeals. The Court of Appeals affirmed, concluding that: (1) Deputy Gilbert had probable cause to stop Alston's vehicle for a violation of South Carolina's failure to maintain a lane statute, reasoning that "a lane of travel constitutes the area between the boundary lines" and, thus, driving on a lane line is a sufficient basis for a traffic stop; (2) Deputy Gilbert had reasonable suspicion to warrant a traffic stop based on his testimony that he observed Alston's vehicle "drifting" and his inquiry at the scene of whether Alston was driving under the influence; (3) Deputy Gilbert's continued questioning of Alston exceeded the scope of the initial traffic stop, however, the extended duration was permissible because Deputy Gilbert had an objectively reasonable and articulable suspicion that illegal activity was occurring; and (4) Alston freely and voluntarily consented to the search. *State v. Alston*, Op. No. 2015-UP-381 (S.C. Ct. App. filed July 29, 2015).

After the Court of Appeals denied Alston's petition for rehearing, this Court granted Alston's petition for a writ of certiorari to review the decision of the Court of Appeals.

## II.    Standard of Review

"On appeal from a motion to suppress on Fourth Amendment grounds, this Court applies a deferential standard of review and will reverse only if there is clear error." *Robinson v. State*, 407 S.C. 169, 180-81, 754 S.E.2d 862, 868 (2014), *cert. denied*, ___ U.S. ___, 134 S. Ct. 2888, 189 L. Ed. 2d 845 (2014). "However, this

deference does not bar this Court from conducting its own review of the record to determine whether the trial judge's decision is supported by the evidence." *State v. Tindall*, 388 S.C. 518, 521, 698 S.E.2d 203, 205 (2010).

## III.    Discussion

### A.    Propriety of the Traffic Stop

Alston asserts the Court of Appeals erred in affirming the trial judge's denial of his motion to suppress.  Initially, Alston contends Deputy Gilbert did not have probable cause to stop Alston's vehicle for a traffic violation or have reasonable suspicion that Alston was involved in criminal activity.  Alston maintains that "merely striking the dotted line dividing two lanes traveling in the same direction" did not constitute a violation of section 56-5-1900 of the South Carolina Code as this action qualified as driving "nearly as practicable entirely within a single lane." Further, Alston claims that, because it was not unsafe for him to change lanes at the time of the incident, his actions did not violate section 56-5-1900.

Additionally, Alston asserts that Deputy Gilbert did not have reasonable suspicion to support a brief investigatory stop solely based on his observation that Alston was drifting within his own lane of travel.  Because there was no evidence that Alston's vehicle was weaving or drifting between two lanes of traffic, Alston claims that his manner of driving could not give rise to reasonable suspicion sufficient to warrant a traffic stop for driving under the influence.

Alternatively, even if the initial stop was proper, Alston maintains that Deputy Gilbert impermissibly exceeded the scope of the traffic stop as he had neither (1) a reasonable and articulable suspicion of illegal activity to warrant the continued detention nor (2) Alston's consent.

The Fourth Amendment to the United States Constitution grants citizens the right to be secure against unreasonable searches and seizures.  U.S. Const. amend. IV.  However, a police officer may "stop and briefly detain a person for investigative purposes" if he "has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

"The Fourth Amendment requires that an officer making an automobile stop have probable cause or reasonable suspicion that the person has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity."  22

C.J.S. *Criminal Procedure & Rights of Accused* § 89, at 389 (2016). "When a peace officer observes any type of traffic offense, the violation establishes both probable cause to stop the vehicle and reasonable suspicion to investigate." *Id.*

"Temporary detention of an individual in the course of a routine traffic stop constitutes a Fourth Amendment seizure, but where probable cause exists to believe that a traffic violation has occurred, such a seizure is reasonable per se." *Tindall*, 388 S.C. at 521, 698 S.E.2d at 205. "In carrying out a routine traffic stop, a law enforcement officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." *Id.* (citing *United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998)). "The officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning." *State v. Pichardo*, 367 S.C. 84, 98, 623 S.E.2d 840, 848 (Ct. App. 2005). "Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention." *Id.*; *see Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) ("Authority for the seizure . . . ends when tasks tied to the traffic infraction are--or reasonably should have been--completed.").

"However, once the underlying basis for the initial traffic stop has concluded, it does not automatically follow that any further detention for questioning is unconstitutional." *State v. Moore*, 415 S.C. 245, 252, 781 S.E.2d 897, 901 (2016) (citation and internal quotation marks omitted). "Lengthening the detention for further questioning beyond that related to the initial stop is acceptable in two situations: (1) the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) the initial detention has become a consensual encounter." *State v. Provet*, 391 S.C. 494, 500, 706 S.E.2d 513, 516 (Ct. App. 2011), *aff'd*, 405 S.C. 101, 747 S.E.2d 453 (2013); *see Moore*, 415 S.C. at 252, 781 S.E.2d at 901 ("The officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." (citation and internal quotation marks omitted)).

In *Provet*, this Court enunciated the test for determining whether reasonable suspicion exists in the context of a traffic stop, stating "[t]he test whether reasonable suspicion exists is an objective assessment of the circumstances; the officer's subjective motivations are irrelevant." *State v. Provet*, 405 S.C. 101, 108, 747 S.E.2d 453, 457 (2013) (citing *Ohio v. Robinette*, 519 U.S. 33, 38 (1996)). Further, this Court has emphasized that "[c]ourts must give due weight to common sense judgments reached by officers in light of their experience and training." *Moore*, 415

S.C. at 252-53, 781 S.E.2d at 901 (citation and internal quotation marks omitted). Additionally, "in evaluating whether an officer possesses reasonable suspicion, this Court must consider the totality of the circumstances--the whole picture." *Id.* at 253, 781 S.E.2d at 901 (citation and internal quotation marks omitted).

As will be discussed, we conclude that, depending on the totality of the circumstances, a motorist who is observed repeatedly weaving within the lane of travel and striking the dotted lines marking this lane may be subject to a traffic stop.

We find this construction comports with the intent of the Legislature to ensure highway safety and the requirement that criminal statutes be construed against the State and in favor of the defendant. *See State v. Baucom*, 340 S.C. 339, 342, 531 S.E.2d 922, 923 (2000) ("All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute."); *State v. Walker*, 349 S.C. 49, 53, 562 S.E.2d 313, 315 (2002) (construing criminal statute strictly against the State and in favor of the defendant).

Cognizant of the rules of statutory construction, we find the text of section 56-5-1900 creates two separate offenses as it mandates that: (1) a motorist drive as "nearly as practicable within a single lane"; and (2) if the motorist departs from the lane of travel, it must be done only when it is safe to do so. In the instant case, we are concerned with the first part of the statute as this was the only basis presented in Alston's motion to suppress. *See State v. Dunbar*, 356 S.C. 138, 587 S.E.2d 691 (2003) (recognizing that an appellate court will not consider issues unless they were raised to and ruled upon in the trial court).

In defining what conduct constitutes a violation of section 56-5-1900, we must parse the initial text of the statute: (1) "entirely within a single lane", and (2) "as nearly as practicable." Although the Legislature prefaced section 56-5-1900 with the word "shall," thus making it mandatory, the phrase "as nearly as practicable" eliminates a finding that this is a strict liability offense. In other words, a motorist's breach of the dividing lines does not necessarily equate to a violation of the statute. *See People v. Chavez-Barragan*, 365 P.3d 981, 984-85 (Colo. 2016) (construing phrase "as nearly as practicable" in a statute similarly worded to section 56-5-1900 and stating that "what is 'practicable' in any given situation depends on the circumstances"); *State v. Prado*, 186 P.3d 1186, 1187 (Wash. Ct. App. 2008) (interpreting phrase "as nearly as practicable" in a statute similarly worded to section 56-5-1900 and concluding that legislature's use of this language "demonstrates a

recognition that brief incursions over the lane lines will happen"); *Dods v. State*, 240 P.3d 1208, 1212 (Wyo. 2010) (analyzing a statute similarly worded to section 56-5-1900 and stating, "when an officer merely observes someone drive a vehicle outside the marked lane, he does not automatically have probable cause to stop that person for a traffic violation. The use of the phrase 'as nearly as practicable' in the statute precludes such absolute standards and requires a fact-specific inquiry to assess whether an officer has probable cause to believe that a violation has occurred").

Thus, the implementation of the statute requires a balance between a motorist's rights and an officer's discretion to assess traffic violations and ensure public safety. As stated by the Supreme Court of Tennessee when it analyzed a statute similarly worded to section 56-5-1900:

> an individual's constitutional rights against unreasonable seizures must be balanced against the public interest of police officers enforcing traffic statutes designed to ensure the safety of the motoring public, pedestrians, and property. While minor traffic infractions may lead to the commendable discovery of an intoxicated motorist, we are cognizant that there are many distractions in today's driving environment that may divert a sober motorist's attention and cause her to momentarily and inadvertently leave her lane of travel. . . . Commentators have cautioned that allowing police officers to stop motorists for de minimis driving anomalies creates a "stop at will" environment at complete odds with the Fourth Amendment.

*State v. Smith*, 484 S.W.3d 393, 411 (Tenn. 2016) (citation omitted).

Applying the above-outlined principles to the facts of the instant case, we find that Deputy Gilbert had probable cause to stop Alston to determine if he was impaired as he observed Alston's vehicle drifting several times and striking the dividing lines of the lane of travel several times. Consequently, we agree with the Court of Appeals that the initial traffic stop was valid.

## B. Extension of the Traffic Stop

Having determined the traffic stop was valid, the question becomes whether Deputy Gilbert extended the detention beyond the purpose of the initial stop. We agree with the Court of Appeals that Deputy Gilbert's questioning exceeded the scope of the initial traffic stop. Approximately fourteen minutes into the traffic stop, Deputy Gilbert received confirmation from the Spartanburg County dispatch that

Alston's license and the vehicle's registration were valid.  Further, Deputy Gilbert gave no indication that he believed Alston was driving under the influence as he found it unnecessary to conduct any field sobriety tests.  At approximately fifteen minutes into the traffic stop, Deputy Gilbert completed the warning.  At that point, the purpose of the traffic stop had been fulfilled.  Yet, Deputy Gilbert did not present Alston with the warning and never returned his license or the vehicle's registration.  Instead, he continued to question Alston prior to asking for consent to search the vehicle.  As found by the Court of Appeals, this continued questioning exceeded the scope of the initial traffic stop.

Thus, we must next analyze whether:  (1) Deputy Gilbert had an objectively reasonable and articulable suspicion illegal activity had occurred or was occurring to extend the duration of the stop; or (2) the detention became a consensual encounter.

Given the trial judge's general ruling, it is difficult to ascertain what evidentiary factors formed the basis of the decision.  As a result, we have concentrated on those identified by Deputy Gilbert during the pre-trial hearing on the motion to suppress.

Mindful of our deferential standard of review, we must affirm as there is evidence to support the trial judge's ruling.  *See Moore*, 415 S.C. at 251, 781 S.E.2d at 900 (identifying the standard of review on appeals from a motion to suppress based on Fourth Amendment grounds and stating, "appellate courts must affirm if there is any evidence to support the trial court's ruling").  While we may have decided the motion to suppress differently than the trial judge, our standard of review prohibits this Court from doing so.  *See id.* ("The clear error standard means that an appellate court will not reverse a trial court's finding of fact simply because it would have decided the case differently." (internal quotation marks and citation omitted)).  Instead, we must, like the trial judge, give due weight to Deputy Gilbert's eleven years of experience and training and defer to his common sense judgments as to why certain observations made him suspicious.

We preface our analysis by noting that Deputy Gilbert testified he was employed with the South Carolina Highway Patrol in July 1999 and began working with the Aggressive Criminal Enforcement Team for the Department of Public Safety and Highway Patrol in 2004.  In 2010, Deputy Gilbert transferred to the Spartanburg County Sheriff's Office and was assigned to the Interstate Criminal Enforcement Team.  In this capacity, Deputy Gilbert received specific training from

the National Criminal Enforcement Association regarding "locating, detecting hidden compartments in vehicles, [and conducting] roadside interviews."

Based on his extensive experience and training, Deputy Gilbert explained why he believed Alston was engaged in criminal activity. We find the following explanations support the trial judge's ruling. Deputy Gilbert identified several inconsistencies in Alston's stated travel plans and the terms of the rental agreement. According to the terms of the agreement, the vehicle was authorized to be operated only in Georgia, Tennessee, Kentucky, Virginia, and West Virginia. Despite these restrictions, Alston was stopped while driving in South Carolina on his way to visit his mother in New Jersey. Alston also indicated that he intended to stay in New Jersey for "about a week," until Monday, April 2, 2011, the date the vehicle was to be returned to a location outside of Atlanta. Alston's claim that he intended to bring his mother back with him for Mother's Day, which is in May, raised "another red flag" for Deputy Gilbert since that holiday was a month and a half away.

While Alston's unusual travel plans and deviations from the rental agreement provide evidence of reasonable suspicion, we question how other seemingly innocuous factors identified by Deputy Gilbert justified extending the traffic stop. Even though Deputy Gilbert believed Alston succumbed to the stress of the situation when he stated he had six children but gave the ages for seven children, this fact is of no consequence as most people are stressed to some extent by an extended traffic stop.

Deputy Gilbert also relied on the fact that he observed Alston driving on Interstate 85, which he characterized as a "major hub for criminal activity in the southeast." Although this factor referenced criminal activity, we are unpersuaded that traveling on Interstate 85 is indicative of one involved in criminal activity given "the number of persons using the interstate highways as drug corridors pales in comparison to the number of innocent travelers on those roads." *United States v. Williams*, 808 F.3d 238, 247 (4th Cir. 2015).

The next set of factors relied on by Deputy Gilbert arose out of observations he made when he approached Alston's parked vehicle. The first of these factors is the fact that Alston's luggage was covered by a blanket, which Deputy Gilbert believed suggested "an intent to divert attention to the luggage and away from the steering column." We question the import of this factor as many innocent travelers

conceal their luggage as a theft deterrent.[6] The second factor was Alston's immediate questioning of Deputy Gilbert as to why he had been stopped. We fail to see the connection, and Deputy Gilbert offered none, as to how such an inquiry is indicative of criminal activity. The third factor was the presence of a "household air freshener," which Deputy Gilbert believed could be used to mask "odors of other things, which could be drugs." Even accepting the premise that air fresheners have been used to mask the odor of drugs, we decline to see the significance of this factor as innocent car owners routinely use air fresheners to mask "odors of other things" such as those emanating from eating in a vehicle.

Additionally, Deputy Gilbert ascertained that Alston's residence was outside of Atlanta, which he characterized as "a major hub for criminal activity in the southeast." While some drug traffickers may hail from this area, the majority of residents do not engage in criminal activity. Next, Alston's use of a car that was rented to a third party, who is female, is of limited value to the reasonable-suspicion evaluation as "the overwhelming majority of rental car drivers on our nation's highways are innocent travelers with entirely legitimate purposes." *Williams*, 808 F.3d at 247. Further, the fact that Alston's girlfriend rented the vehicle and paid for Alston to be an authorized driver is not inherently suspicious as couples who travel often engage in this practice. Also, we are not persuaded by the general assertion that drug traffickers commonly use a female to enter into a rental agreement because law enforcement is less likely to suspect a female of criminal activity. Were we to accept Deputy Gilbert's proposition, then we would necessarily accept the illogical inference that only males engage in criminal activity. A rented car is a rented car. The gender of the renter is irrelevant especially when the driver of the rented vehicle is an authorized driver. Finally, Deputy Gilbert's reliance on the inclusion of personal keys on the rental car key ring is of limited value given Deputy Gilbert offered no connection, and we discern none, as to how this innocent act is indicative of criminal activity.

Nevertheless, because there is evidence to support the trial judge's determination that Deputy Gilbert had reasonable suspicion of criminal activity to extend the scope of the stop beyond its initial purpose, we must affirm as did the Court of Appeals.

---

[6] Notably, apparently recognizing this common practice, most car manufacturers are now equipping hatch-back vehicles with retractable shields for this very purpose.

## C. Consent to Search

Finally, Alston claims the warrantless search was unreasonable because he did not voluntarily consent to Deputy Gilbert's request to search the vehicle. In support of this claim, Alston identifies several statements he made in response to the request to search, which were recorded during the traffic stop. Specifically, Alston explains that when Deputy Gilbert asked for consent to search the vehicle, he responded that he was "just trying to figure what all this is about" and that he "didn't do anything wrong." Alston emphasizes that he told Deputy Gilbert, "[N]ah, I'm not giving you consent, you the one giving consent." Alston further notes that Deputy Gilbert never returned his license and rental agreement and failed to give him the citation for the traffic violation. Alston also points out that a second law enforcement officer was present during the discussion regarding consent.

In reviewing the trial judge's findings of fact regarding the voluntariness of Alston's consent, we apply a deferential standard of review. *Provet,* 405 S.C. at 113, 747 S.E.2d at 460. "The issue of voluntary consent, when contested by contradicting testimony, is an issue of credibility to be determined by the trial judge." *State v. Mattison*, 352 S.C. 577, 584-85, 575 S.E.2d 852, 856 (Ct. App. 2003).

"A warrantless search is reasonable within the meaning of the Fourth Amendment when voluntary consent is given for the search." *Provet*, 405 S.C. at 113, 747 S.E.2d at 460. "The existence of voluntary consent is determined from the totality of the circumstances." *Id*. "When the defendant disputes the voluntariness of his consent, the burden is on the State to prove the consent was voluntary." *Id*. "A consent to search procured during an unlawful stop is invalid unless such consent is both voluntary *and* not an exploitation of the unlawful stop." *Id*. at 114, 747 S.E.2d at 460 (citation and internal quotation marks omitted).

Having found the detention lawful, our remaining question is limited to determining whether there is evidence to support the trial judge's finding that Alston voluntarily consented to the warrantless search.

During the suppression hearing, Deputy Gilbert acknowledged the statements relied on by Alston. However, he expressly testified that Alston gave him consent to search the vehicle. Deputy Gilbert stated that, after he told Alston that he could refuse to give consent, Alston responded "then go ahead" and pointed to the car. Deputy Gilbert further testified that, in an effort to get a "yes" or "no" answer from Alston, he explained this right. According to Deputy Gilbert, Alston responded "yes" after receiving this explanation. Deputy Gilbert denied coercing Alston or

producing his weapon during the encounter.  Deputy Gilbert also maintained that Alston never withdrew his consent.

Because Alston's statements conflicted with Deputy Gilbert's testimony, it was within the province of the trial judge, as the trier of fact, to determine this issue of credibility.  Considering the totality of the circumstances, we conclude there is evidence in the record to support the trial judge's finding that Alston voluntarily consented to the warrantless search.

## IV.    Conclusion

Based on our rules of statutory construction, we hold the offense of failure to maintain a lane is not a strict liability offense.  As a result, an officer must consider all relevant circumstances in deciding whether to stop a vehicle for a violation of this statute.  Applying this interpretation to the facts of the instant case, we conclude there is evidence to support the trial judge's finding that the initial traffic stop was valid.  Further, we find there is evidence to support the trial judge's determination that Deputy Gilbert had reasonable suspicion of criminal activity to extend the scope of the stop beyond its initial purpose and that Alston voluntarily consented to the warrantless search.  Therefore, while we agree with the result reached by the Court of Appeals, we modify its analysis regarding the interpretation of section 56-5-1900 and the basis for which Deputy Gilbert had reasonable suspicion to extend the duration of the traffic stop.  Accordingly, the decision of the Court of Appeals is

**AFFIRMED AS MODIFIED.**

**HEARN, J., concurs.  FEW, J., concurring in a separate opinion in which KITTREDGE, J., concurs.  Acting Justice Costa M. Pleicones, concurring in result only.**

**JUSTICE FEW:** I concur in all sections of the majority opinion except section III.B. As to that section, I agree with the result reached by the majority because there is ample evidence to support the trial court's finding that Deputy Gilbert had reasonable suspicion Alston was engaged in criminal activity, and thus the extended detention was reasonable under the Fourth Amendment. *See State v. Moore*, 415 S.C. 245, 251, 781 S.E.2d 897, 900 (2016) (holding "appellate courts must affirm if there is any evidence to support the trial court's ruling").

I disagree, however, with the majority's concern as to "how other seemingly innocuous factors identified by Deputy Gilbert justified extending the traffic stop." In most cases, none of the individual observations an officer makes will justify reasonable suspicion. In this case, as the majority points out, Deputy Gilbert identified at least twelve individual facts that caused him to suspect Alston was engaged in criminal activity. Some of those facts are almost meaningless even when considered as part of the totality of the circumstances, and none of them would independently support reasonable suspicion to extend the traffic stop. As we have repeatedly held, however, we should not focus on any one factor, but we must consider the totality of the circumstances observed by the officer. *See, e.g.*, *Moore*, 415 S.C. at 253, 781 S.E.2d at 901 (stating "this Court must 'consider "the totality of the circumstances—the whole picture"'" (quoting *United States v. Sokolow*, 490 U.S. 1, 8, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1, 10 (1989))); *State v. Taylor*, 401 S.C. 104, 108, 736 S.E.2d 663, 665 (2013) ("Courts must look at the cumulative information available to the officer [] and not find a stop unjustified based merely on a 'piecemeal refutation of each individual fact and inference.'" (quoting *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008))).

The majority discounts, for example, the fact Alston told Deputy Gilbert he had six children, and then recited the ages of seven children. Alston gave Deputy Gilbert inconsistent information on a subject anybody ought to be able to speak consistently about—the number and ages of his children. Based in part on that inconsistency, Deputy Gilbert reached the conclusion Alston was feeling "the stress of the situation." The inconsistency alone would not support a finding of reasonable suspicion, but the majority is incorrect to say "this fact is of no consequence." Alston's inability to recite the correct number of his children in a stressful situation is suspicious.

I also disagree with the majority's criticism of Deputy Gilbert's reliance on the facts Alston was from near Atlanta, he was driving a car rented by a third person who was not in the car, and the person who did rent the car was female. The majority states these facts are "not inherently suspicious." Even if the majority was correct, however, its statement would be of minimal importance. Our standard of review requires us to consider the facts in light of the *officer's* explanation as to why *he* thought they were significant, and why they made *him* suspicious. *See United States v. McCoy*, 513 F.3d 405, 411 (4th Cir. 2008) (stating "the Supreme Court has often counseled lower courts to give 'due weight' to the factual inferences drawn by police officers as they investigate crime, for the reasonable suspicion analysis is by its nature 'officer-centered'" (citations omitted)). None of these facts by themselves could support a finding of reasonable suspicion, but Deputy Gilbert explained why he thought each of them had some significance.

This point is illustrated by Deputy Gilbert's reliance on the fact the car was rented by a female who was not in the car. Deputy Gilbert testified he learned "through the classes and the training that I've been through, a lot of your criminal organizations will rent a vehicle in a woman's name for the simple fact that law enforcement does not -- they are not threatened by a woman." Rejecting what Deputy Gilbert learned in his professional training, the majority states, "Were we to accept Deputy Gilbert's proposition, then we would necessarily accept the illogical inference that only males engage in criminal activity." This criticism is based on a misapplication of our standard of review, and misses the significance of Deputy Gilbert's testimony on this subject. When law enforcement officers are trained to consider a certain fact to be important in the officer's attempts to deal with crime on the streets, it is not appropriate for judges to sit in our easy chairs in our secure offices and simply disagree. *See State v. Morris*, 411 S.C. 571, 578, 769 S.E.2d 854, 858 (2015) (repeating the Supreme Court of the United States' skepticism of the capacity of "legal technicians" to understand reasonable suspicion (quoting *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004), which cited *Ornelas v. United States*, 517 U.S. 690, 695-96, 116 S. Ct. 1657, 1661, 134 L. Ed. 2d 911, 918 (1996))). Deputy Gilbert testified he was trained to consider the fact a car was rented in the name of a female to be one fact indicative of drug trafficking because that is a trick drug traffickers use to avoid detection. Describing the possibility this trick might fool a police officer, Deputy Gilbert testified, "At least that's what the drug

trafficking organizations think."  If the inference criticized by the majority is "illogical," Deputy Gilbert explained that it is an illogical inference drawn by drug traffickers.

For the reasons explained, I vote to **AFFIRM** Alston's conviction for trafficking in cocaine.

**KITTREDGE, J., concurs.**